IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

   v.

JEFFREY ALAN BOURASSA,

     Defendant.

CRIMINAL ACTION FILE

NO. 4:18-CR-0003-MLB-WEJ-1

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on the following Motions filed by defendant Jeffrey Alan Bourassa:  (1) a Motion to Suppress Search and Seizure [523] that arose from a traffic stop that occurred on March 24, 2006; (2) a Motion to Suppress Search and Seizure [631] that arose from execution of a search warrant at a residence located at 2200 Beaver Shop Road in Cobb County, Georgia on June 8, 2006; and (3) a Motion to Suppress Search and Seizure [527] that arose from a traffic stop that occurred on March 9, 2013.

The Court conducted an evidentiary hearing on these Motions on February 28, 2019 [618], which has been transcribed ("Tr.") [635].  These Motions have been fully briefed (see Def.'s Br. [687]; Gov't Opp'n Br. [692]; Def.'s Reply [703]) and are ripe for decision.  For the reasons explained below, the

undersigned **RECOMMENDS** that Mr. Bourassa's Motions to Suppress Search and Seizure [523, 527, and 631] be **DENIED**.

## I.      THE INDICTMENT

On February 8, 2018, a grand jury in this District returned an Indictment [1] charging Jeffrey Alan Bourassa and others with violations of federal law, including RICO conspiracy (Count 1), conspiracy to possess and distribute controlled substances and substantive drug offenses (Counts 2, 19), carjacking (Count 3), attempted murder (Counts 4, 6, 13-14), kidnapping (Counts 9, 11), maiming (Count 10), assault (Count 12), and various firearms violations (Counts 5, 7-8, 15-18, 20-21). The charges are based on the defendants' alleged activities as members or associates of a criminal enterprise known as the Ghostface Gangsters ("GFG").

With specific reference to Mr. Bourassa, the Indictment charges him in Count 1 with RICO conspiracy; in Count 2 with conspiracy to traffic a controlled substance and alleges that he is responsible for the distribution of at least 500 grams of methamphetamine (a Schedule II controlled substance), a substance containing a detectable amount of cocaine (a Schedule II controlled substance), a mixture and substance containing a detectable amount of marijuana (a Schedule I controlled substance), and a substance containing Alprazolam (a Schedule IV

2

controlled substance); in Count 9 with kidnapping; and in Count 10 with maiming. The grand jury returned a Superseding Indictment [279] on August 22, 2018.  The Superseding Indictment adds three defendants and new overt acts and substantive charges involving drug sales, firearms, and witness tampering.  However, the charges against Mr. Bourassa were left unchanged.

## II.   STATEMENT OF FACTS

### A.   Traffic Stop on March 24, 2006

The Government described this traffic stop through the testimony of Detective Bradley McEntyre, who worked for the Cobb County Police Department in 2006 in the Crimes Against Persons Unit.  (Tr. 5.)  On March 24, 2006, Detective McEntyre, along with Detectives Caldwell and Twiggs, responded to radio traffic regarding a strong-arm robbery and shots fired at Cumberland Mall.  (Id. at 5-6.)  Further radio traffic reported a carjacking at the intersection of U.S. Highway 41 and Akers Mill Road adjacent to the Mall.  (Id. at 6, 20-21.)  Detectives Twiggs and Caldwell went to the Mall and Detective McEntyre, who learned that the hijacking victim (Maria Arajuo) was at the Embassy Suites on Akers Mill Road, went to that location to interview her.  (Id. at 6-7, 19-20.)  In the course of their initial investigation, law enforcement concluded that the two incidents were likely related.  (Id. at 6-7.)

3

Detective McEntyre interviewed the victim, who relayed what had happened to her and provided a description of the assailant as a young white male, early 20s, fairly short, dark hair, with something like silver on his front teeth, waiving a gun. (Tr. 7-8.)[1] As Detective McEntyre was interviewing the victim, he received information that her hijacked car had been found at a parking deck close to where the crime had occurred. (Id. at 8, 21.) He then travelled to that location. (Id. at 8.)

When he arrived at the parking deck, Detective McEntyre learned from other officers that there had been some sort of "drug deal gone bad" at the Mall, that shots had been fired, that one of the individuals involved had fled through the Mall's parking lot toward the intersection of Highway 41 and Akers Mill Road, and that this individual was the suspected carjacker. (Tr. 8-9.) Witnesses from the Mall and those who observed the carjacking described this individual as wearing a gray hooded sweatshirt. (Id. at 9.)[2]

───────────────────

[1] Ms. Araujo did not speak English, so Detective McEntyre conducted the interview through her niece who provided translation services. (Tr. 7.)

[2] The description of the suspect provided by the victim was consistent with the descriptions provided by the various witnesses. (Tr. 10.)

4

A description of the suspect was broadcast to all police personnel.  (Tr. 10.) Given the significant response of law enforcement to these incidents, a large number of police officers were spread out over the area looking for the suspect. (Id. at 9.)  Specifically, officers were on the lookout for a short white male, early 20s, with dark hair and silver on his front teeth, wearing a gray hooded sweatshirt.

About one hour after the carjacking, plainclothes officer Ken Rita reported that he saw a person fitting the description of the suspect acting suspiciously outside of a Red Lobster restaurant located about a quarter mile from where the incident occurred.  (Tr. 9, 21.)[3]  A tactical unit set up surveillance and observed a dark-colored Mazda with two occupants pull up in front of the restaurant and pick up the suspect.  (Id. at 10, 21.)  When the Mazda started to leave, it travelled no more than 100 yards before it was stopped by police at a BP gas station located at Highway 41 and Herodian Way.  (Id. at 10, 21-22.)

Detective McEntyre went to the BP station, where the suspect, later identified as co-defendant David Gene Powell, was in custody.  (Tr. 10-11, 22.)

_____

[3] The individual acting suspiciously was a short male wearing a gray hooded sweatshirt.  (Tr. 9.)  Although there was no testimony on this point, if Officer Rita noticed the suspect's stature, sex, and clothing, he assuredly noticed he was white with dark hair and in his early 20s.

5

The Detective testified that the other two occupants of the Mazda, the driver (Kimberly Mines) and the front-seat passenger (Mr. Bourassa), were also in custody.  (Id. at 11, 12, 13, 22.)[4]  A K-9 brought in to track the suspect from the carjacking alerted to a purse that was on the front passenger floorboard.  (Id. at 12-13.)  The search of the suspects and the Mazda located Ecstasy tablets in the purse, Valium and a Kel-Tec PT-11 9mm handgun on Mr. Powell, and $8,177 in cash on Mr. Bourassa.  (Id. at 13-14, 22-23.)

### B.    Execution of a Search Warrant on June 8, 2006

The Government described this search through the testimony of ATF Special Agent Mathew Owen (who previously worked as a uniformed officer with the Cobb County Police Department) and Lieutenant Donald Zell of the Cobb County Police Department, who was in 2006 a Sergeant and morning watch (10:00 p.m. to 8:00 a.m.) shift supervisor for Precinct 4.  (Tr. 55, 78-79.)

Then-Officer Owen testified that he was working morning watch in Precinct 4 on June 8, 2006, wearing a police uniform and driving a marked

_____

[4] Detective McEntyre did not determine the ownership of the Mazda at the time.  (Tr. 11.)  The Government has since learned that the Mazda 626 was registered to Tony Lane Phillips, who is Ms. Mines's step-father.  (See Ex. 1 to Gov't Opp'n [692-1], at 2.)

vehicle. (Tr. 56.) On that date at approximately 2:00 a.m., he received a 911 call from an individual who said that a white male wearing black shorts pointed a silver automatic pistol at him and that he had been ordered to leave a house located at 2200 Beaver Shop Road. (Id. at 56, 65-66.)[5] Sergeant Zell added that the 911 caller said he had been at a party at this address and saw a large quantity of drugs. (Id. at 80.)

Officer Owen went to the house immediately along with Officers New and Withers. (Tr. 56-57, 66.) Occupants of the house were not visible. (Id. at 56-57.) Officers Owen and Withers went to the front door of the house, while Officer New went to the back corner of the house. (Id. at 57, 69.) As Officer Owen walked up the driveway and by the carport on the way to the front door, he could see through a window located in the carport; he noticed a white male in a short-sleeved striped shirt in the kitchen area. (Id. at 69.) When the officers arrived at the front door, Officer Withers knocked and announced, "Cobb County Police. I need to speak to someone." (Id. at 57, 69.) Someone inside responded, "Who's there?" and different persons inside the house asked that same question repeatedly.

---

[5] The complainant identified himself as Jonathan Smith. (Tr. 65.) Officer Owen testified that this might not have been the caller's real name, as police had no more contact with him after receiving his 911 call. (Id. at 65-66.)

(Id. at 57, 70.)  However, no one would open the door.  (Id. at 70.)  Officer Owen then knocked and announced that it was the Cobb County Police, that they needed to talk to someone about an incident, and that someone needed to come outside. (Id. at 57-58.)  Again, no one came out.  Instead, someone came to the door and repeatedly stated, "Who is it?"  (Id. at 58.)  Finally, someone came to the front door and stated, "You're not coming in without a warrant."  (Id. at 58, 70, 87.)

Officer Owen felt the situation was escalating, so he stepped off the small, low front porch and walked to the right along the front side of the house that faced the street.  This end of the house had two windows, the first of which was fully covered and the second of which was only partially covered.  (Tr. 58, 70-72.)[6]  He was able to see into the house through this second window, and through that window, he observed a man come into what appeared to be a bedroom carrying two large Ziploc bags full of marijuana.  (Id. at 58-59, 72-73, 81.)[7]  This

---

[6] A photograph of the front of the house showing the garage, the front porch, and the two windows to the right of the porch is in evidence as Defendant's Exhibit 2.  Officer Owen's description of the house (Tr. 66-67) matches the photograph.

[7] There were three other people in that bedroom, two women and a man. (Tr. 59, 73-74.)  None of them appeared to be in distress.  (Id. at 59, 74.)

male subject placed the bags of marijuana in the closet and quickly left the room. (<u>Id.</u> at 74.)

Officer Owen immediately backed off, informed the other officers about what he had seen, and together they established a perimeter. (Tr. 59, 75.) He also alerted his supervisor (then-Sergeant Zell) about the marijuana; he was told to sit tight until other officers arrived. (<u>Id.</u> at 59-60, 75.) Officer Owen and the other two officers continued to observe the house. Most of the lights had been turned off, but the officers could hear people moving around inside. (<u>Id.</u> at 60.)

Before other officers arrived at this location, two females came out of the house and were detained. (Tr. 60-61, 63, 75.) When asked who else was in the house, they first told the officers that no one else was inside, but then changed their story to say that their roommates "might be inside." (<u>Id.</u> at 61.) When asked had they seen a gun or illegal narcotics in the house, both women responded in the negative. (<u>Id.</u> at 61-62.) One of the women was identified as Kimberly Mines. (<u>Id.</u> at 61.) When Officer Owen asked Ms. Mines who lived at the house, she replied that she and her roommates, Mark and Ryan, lived there. (<u>Id.</u> at 61, 82.) Officer Owen could not recall if she mentioned Mr. Bourassa. (<u>Id.</u> at 61.)

Approximately ten to fifteen minutes after Officer Owen called in what had transpired at the residence, Sergeant Zell arrived and notified the Marietta-Cobb-

Smyrna ("MCS") narcotics team of what had been learned. (Tr. 60, 75, 81.)[8] MCS agents subsequently arrived, and Officer Owen relayed to them what he had seen; meanwhile, Officer New continued to try to communicate with the individuals remaining inside the house. (Id. at 62, 81-82.) The occupants were told that a search warrant was on its way. (Id. at 83.) Before the search warrant arrived, three males (including Mr. Bourassa) came out of the house and were detained. (Id. at 62-63, 82-83.)

MCS obtained a search warrant for 2200 Beaver Shop Road based on information that Officer Owen provided. (Tr. 63, 76, 82.) A copy of the Affidavit and Application for a Search Warrant is in the record as Government Exhibit 2 [619-2]. (Tr. 85-86.) When the warrant was served, officers located marijuana hidden in a sofa and a silver-colored gun hidden in a toilet tank. (Id. at 63-64, 84-85.)[9]

---

[8] Sergeant Zell testified that the two females exited the house after he arrived on the scene. (Tr. 82.) This conflict with Officer Owen's testimony is not material.

[9] Officer Owen was present when the detained individuals were given Miranda warnings and questioned by MCS agents. An individual named Ryan initially said that the marijuana was his, but later recanted, stating that some of the marijuana belonged to him, but some belonged to Mark and Jeff (i.e., Mr. Bourassa). Ryan stated that he initially took responsibility for all of the

10

### C.   <u>Traffic Stop on March 9, 2013</u>

The Government described this stop using the testimony of Captain Brett Dever of the Douglas County Sheriff's Department, who in March of 2013 worked as a Lieutenant and watch commander, supervising a night patrol shift (5:30 p.m. to 6:00 a.m.).  (Tr. 24-26.)  Then-Lieutenant Dever testified that on March 9, while in police uniform and driving a marked vehicle, he received information from other law enforcement officers about a white Jeep Liberty.  (<u>Id.</u> at 26.)  Specifically, the Narcotics Unit of the Sheriff's Department suspected that this vehicle was transporting drugs.  (<u>Id.</u> at 49-50.)  He was asked to be on the lookout for this vehicle; he was not directed to stop it.  (<u>Id.</u> at 49.)  He also knew the likely occupants of the vehicle and that one of them (Mr. Bourassa) had an active warrant for a probation violation.  (<u>Id.</u> at 50-51.)

At about 8:00 p.m. that evening, while parked on Interstate 20 observing the eastbound lanes of traffic at the eastbound ramp to Lee Road, the Lieutenant spotted the Jeep traveling eastbound in the middle lane.  (Tr. 26-27, 40, 42.)  It was tailgating a maroon minivan.  (<u>Id.</u> at 27.)  Following too closely at the speed

---

marijuana because he had the least amount to lose and was the only one not on probation.  (Tr. 64.)

the vehicles were travelling is a violation of Georgia law. (Id.) When the Jeep passed Lieutenant Dever's location, it started to coast, which increased the distance between the Jeep and the minivan. (Id.) Lieutenant Dever pulled out from his location to follow the Jeep and monitored the vehicle as it continued eastbound. (Id.) The Interstate at this point has three lanes, which allows slower drivers to move to the right to allow faster drivers to pass on the left; however, the Jeep remained in the middle lane. (Id. at 27-28, 43.) Lieutenant Dever testified that Georgia law requires drivers to move to the right if traveling at less than the posted speed limit. (Id. at 28.) At this point the Jeep was traveling at 55 miles per hour, ten miles per hour below the posted speed limit of 65 miles per hour. (Id. at 28, 43.)

After following the Jeep for less than two miles, Lieutenant Dever elected to pull it over and did so without any problems. (Tr. 28-29, 44.) He approached the vehicle on the passenger side and made contact with the driver, a woman named Lindsey Hollingsworth, and the defendant, who was in the front passenger seat; there was a small child in the backseat. (Id. at 29, 45.) Lieutenant Dever detected the odor of green marijuana as soon as the car windows opened. (Id. at 32, 52.) The Lieutenant explained the violations he had seen to the occupants of the car, and they both provided excuses as to why they had been driving slowly.

12

(Id. at 29-30, 45-46.)  Ms. Hollingsworth provided him with a Georgia driver's license and an insurance card for a different vehicle (i.e., a 1992 Honda Accord). Ms. Hollingsworth also gave the Lieutenant a rental agreement for the Jeep Liberty and told him that her car was being repaired.  (Id. at 30, 46.)  The rental agreement listed only Ms. Hollingsworth as the renter.  (Id. at 30-31.)

Defendant Bourassa did not have any identification, and Lieutenant Dever noticed that Ms. Hollingsworth appeared extremely nervous.  (Tr. 31.)  He also noticed that the child in the backseat was not in appropriate restraints, another violation of Georgia law, which he explained to the driver.  (Id. at 31-32.)  He continued to explain the reasons for the stop to Ms. Hollingsworth and asked her to step to the rear of the car so he could issue her a citation.  (Id. at 33, 46.)[10]

Captain Dever testified that when he retrieved his citation book, he called his K-9 officer to come to the traffic stop to investigate the smell of green marijuana.  (Tr. 33, 46-47.)  At this point, defendant was still sitting in the front seat of the car and the baby was in the back.  (Id. at 33.)  As they waited for the K-9 officer to arrive, Lieutenant Dever confirmed Ms. Hollingsworth's identity

---

[10] Ms. Hollingsworth eventually received a written warning for impeding the flow of traffic and a verbal warning for following too closely.  (Tr. 33, 46.)

and her rental of the Jeep Liberty, wrote the citation, and conducted a license check.  (Id. at 33-34, 46.)  The K-9 officer arrived within one minute of being summoned.  (Id. at 34, 47.)

As was his practice, Lieutenant Dever asked Ms. Hollingsworth for consent to search the Jeep Liberty, which she granted.  (Tr. 34.)  Before searching, Lieutenant Dever asked Ms. Hollingsworth who owned the items in the car; she replied that they belonged to her.  (Id. at 38.)  He asked the defendant to get out of the car with the child so as to allow the dog to perform the free-air sniff, and he complied.  (Id. at 34-36, 47-48.)  The K-9 alerted to the car, and Lieutenant Dever searched it.  (Id. at 37.)  He found about $4,800 in the center console, four telephones, and a pound of marijuana in the rear storage area.  (Id. at 37-38.)  Mr. Bourassa disclaimed these items, but Ms. Hollingsworth claimed ownership of the money and the marijuana.  (Id. at 38-39, 50.)

Lieutenant Dever testified that, since the defendant had no identification, he asked him to write his name and birthdate on a 3x5 card, but the information he provided belonged to his brother, Jason.  (Tr. 39-40.)  Had defendant provided accurate information, he would have been arrested on the aforementioned outstanding warrant.  (Id.)

14

### III.   **THE PARTIES' CONTENTIONS**

Defendant argues that the March 24, 2006 traffic stop of the Mazda 626 driven by Ms. Mines was made without probable cause and was thus illegal under the Fourth Amendment.[11]  Specifically, Mr. Bourassa asserts that the description of the hijacking suspect, later identified as co-defendant David Powell, was insufficient to allow officers to form a "particularized and objective basis to instigate the stop of the Mazda." (Def.'s Br. 13.)  Therefore, he seeks to suppress the evidence found during the search (i.e., $8,177 located on defendant's person and pills found in a purse located between his feet).  The Government responds that the stop of the Mazda 626 driven by Ms. Mines was legally supported, and that as a passenger, Mr. Bourassa lacks standing to object to the vehicle's search. (Gov't Opp'n 14-15.)

_____

[11] The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

15

With regard to the search of the residence at 2200 Beaver Shop Road on June 8, 2006, defendant argues that the warrant was based on an unauthorized entry onto the home's curtilage that violated the Fourth Amendment.  Defendant claims that there were no exigent circumstances associated with this entry, because nothing police learned from the entry confirmed the information provided in the 911 call.  (Def.'s Br. 27 n.5.)  Defendant asserts that because the warrant was not supported by probable cause, the resulting search was illegal and the evidence seized (i.e., marijuana and a gun) must be suppressed.  The Government responds that Mr. Bourassa has made no showing that he had any legitimate expectation of privacy in the residence, as he was merely present and not an overnight guest.  Without standing, he cannot contest the search.  (Gov't Opp'n 21.)  Even if he had standing, the Government contends that officers did not violate the Fourth Amendment.  (Id. at 22-24.)

Finally, in reference to the traffic stop of the Jeep Liberty driven by Ms. Hollingsworth on March 9, 2013, Mr. Bourassa argues that the stop was based on an unreasonable mistake of Georgia law by the officer and was therefore invalid. Defendant further argues that the stop was clearly pretextual and that the officer's intent to assist in a narcotics investigation was the basis for the stop and not an observed traffic violation.  Thus, defendant asserts that evidence seized following

16

that search (i.e., about $8,400 and a pound of marijuana) should be suppressed. (Def.'s Br. 20-21.)  The Government responds that, because Mr. Bourassa was a passenger in a rented Jeep Liberty driven by Ms. Hollingsworth, he has no standing to object to the search.  (Gov't Opp'n 17.)  Although the Government agrees that defendant may challenge the stop, it asserts that the stop was based on a traffic violation observed by an officer and that his knowledge regarding the vehicle and its occupants did not invalidate the stop.  (Id. at 17-20.)

## IV.   ANALYSIS

Because the Government argues that Mr. Bourassa lacks standing to contest the search of the Mazda 626 on March 24, 2006, the search of the residence at 2200 Beaver Shop Road on June 8, 2006, and the search of the Jeep Liberty on March 9, 2013, the Court addresses this topic first.

### A.   Standing

Although the question of whether a search violates the Fourth Amendment rights of a particular defendant is often referred to as "standing," it is more properly subsumed under Fourth Amendment doctrine.  Rakas v. Illinois, 439 U.S. 128, 139 (1978).  The analysis focuses on whether the challenged search "violated the Fourth Amendment rights of [the] criminal defendant who seeks to exclude the evidence."  Id. at 140.  "It is immaterial if evidence sought to be

introduced against a defendant was obtained in violation of someone else's fourth amendment rights.  Fourth amendment rights are personal and cannot be asserted vicariously." United States v. Arango, 912 F.2d 441, 445 (10th Cir. 1990); see also United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000) ("Fourth Amendment rights, however, are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search.").  The defendant has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search. Rakas, 439 U.S. at 130 n.1.

To determine whether a search has violated the rights of a particular defendant who seeks to exclude the resulting evidence, a court considers two primary factors:  (1) whether the defendant manifested a subjective expectation of privacy in the area searched, and (2) whether society would recognize that expectation as objectively reasonable.  See Minnesota v. Carter, 525 U.S. 83, 88 (1998); Smith v. Maryland, 442 U.S. 735, 740 (1979).  In deciding whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law, bearing in mind that "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas, 439 U.S. at 143 & n.12.  "Although neither ownership nor

18

lawful possession are determinative, they are often dispositive factors." <u>Arango</u>, 912 F.2d at 446.

### 1.    <u>The Vehicle Searches</u>

There were two vehicle searches here: one on March 24, 2006, of the Mazda 626 and another on March 9, 2013, of the Jeep Liberty.  Defendant was a passenger in both of those vehicles.  "It is well-settled that a mere passenger in a car does not have a reasonable expectation of privacy in that car and therefore does not have standing to challenge a search of that car." <u>United States v. Portela</u>, No. 14-20017-CR, 2015 WL 13021487, at *7 (S.D. Fla. Jan. 30, 2015) (citing <u>Rakas</u>, 439 U.S. at 128), <u>report and recommendation adopted</u>, No. 14-20017-CR, 2015 WL 13016399 (S.D. Fla. Feb. 18, 2015), <u>aff'd sub nom.</u> <u>United States v. Dixon</u>, 901 F.3d 1322 (11th Cir. 2018); <u>see also</u> <u>United States v. Lee</u>, 586 F.3d 859, 864 (11th Cir. 2009) ("We have held that a 'passenger[] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car.'") (quoting <u>United States v. Harris</u>, 526 F.3d 1334, 1338 (11th Cir. 2008) (per curiam)); <u>United States v. Cooper</u>, 133 F.3d 1394, 1398 (11th Cir. 1998) ("A passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the

19

driver owns or rents it."); <u>United States v. Barnes</u>, 596 F. App'x 821, 822 (11th Cir. 2015) (defendant lacked standing to challenge the search of the rental vehicle in which he was a passenger). Thus, Mr. Bourassa lacks standing to challenge both vehicle searches because he has failed to meet his burden of establishing a legitimate expectation of privacy in them.

### 2. **The Search of the Residence**

With regard to the search of the residence at 2200 Beaver Shop Road, it is Mr. Bourassa's burden to show that he has standing to contest it. <u>See</u> <u>United States v. Sneed</u>, 732 F.2d 886, 888 (11th Cir. 1984) ("the defendant as the movant to suppress evidence has the burden of establishing his 'legitimate expectation of privacy'"). Moreover, when someone other than the owner or lessee makes a standing claim, he must demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy. <u>United States v. Garcia</u>, 741 F.2d 363, 366 (11th Cir. 1984). Mr. Bourassa attempts to carry that burden by asserting he has standing both as an overnight guest and as a social visitor. (Def.'s Br. 25 n.4.)[12]

_____

[12] In his Reply Brief, Mr. Bourassa asserts for the first time that he has standing as a tenant at the residence. (Def.'s Reply 25.) The Court will not

20

With regard to Mr. Bourassa's claim that he was an overnight guest, he failed to submit any evidence showing that he was actually spending the night at 2200 Beaver Shop Road.  For example, there is no claim that defendant brought a suitcase or toiletries with him or that he was sleeping on the couch or in the one of the bedrooms.  See United States v. Son, No. 1:12-CR-42-ODE-JFK, 2012 WL 4711978, at *8 (N.D. Ga. Oct. 2, 2012) ("Although the Supreme Court has found an overnight guest can have a reasonable expectation of privacy in the home of another, Defendant here fails to 'demonstrate a significant and current interest in the searched premises.'") (quoting Garcia, 741 F.2d 366); United States v. Manson, No. 1:11-CR-13-AT-LTW-2, 2011 WL 8199403, at *8 (N.D. Ga. Dec. 7, 2011), report and recommendation adopted, No. 1:11-CR-13-AT-LTW-2, 2012 WL 2861595 (N.D. Ga. July 11, 2012) (defendant lacked standing because he offered no evidence showing that he stayed overnight at the residence searched).[13]

---

consider an argument made for the first time in a reply brief.  See Rindfleisch v. Gentiva Health Servs., Inc., 22 F. Supp. 3d 1295, 1301 (N.D. Ga. 2014) ("As a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief.")  In any event, even if the Court were to consider this argument, it lacks support in the record.  No one identified defendant as a tenant.

[13] Defendant argues that his presence at the residence at such a late hour indicates both his and his host's expectation that he would remain through the evening, as does the fact that officers saw the lights go out.  (Def.'s Reply 28.)

21

With regard to Mr. Bourassa's claim that he has standing as a social visitor, the 911 caller mentioned that he had been at a party at 2200 Beaver Shop Road when he was threatened with a gun.  Perhaps Mr. Bourassa was attending that same party, but he never submitted evidence showing why he was there.  This failure prevents the Court from concluding that he had a legitimate expectation of privacy in the premises searched.  See United States v. Jackson, 155 F. Supp. 3d 1320, 1327 (S.D. Fla. 2014), aff'd, 618 F. App'x 472 (11th Cir. 2015) ("The record before the Court remains void of any explanation of Defendant Jones's presence in the efficiency unit, and, therefore, any basis upon which the Court could even attempt to reach the threshold issue that Defendant Jones had a legitimate expectation of privacy in the premises searched or the items seized.").

Even if defendant had submitted evidence showing that he was present with the consent of a tenant, he cites no case holding that mere status as a social

---

This argument carries no weight.  First, no one testified concerning the expectations of Mr. Bourassa or his host (whoever that was).  Second, the fact that both the contact with police and the search occurred in the middle of the night does not transform Mr. Bourassa into an overnight guest.  Finally, the reasonable inference from most of the lights being extinguished is that the persons inside the house did not want officers outside to see them, not that they were going to sleep.

22

guest provides standing to contest a search.[14]  Instead, a Supreme Court case he cites, <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998), holds that while an overnight guest in a home may claim the protection of the Fourth Amendment, one who is merely present with the consent of the householder may not.  <u>Id.</u> at 90; <u>see also</u> <u>United States v. Burke</u>, 521 F. App'x 720, 723 (11th Cir. 2013) ("A defendant may have a legitimate expectation of privacy in a premises he did not own or rent if he demonstrates 'an unrestricted right of occupancy or custody and control of the premises distinguished from occasional presence on the premises as a mere guest or invitee.'") (quoting <u>United States v. Baron–Mantilla</u>, 743 F.2d 868, 870 (11th Cir. 1984)); <u>United States v. Rackley</u>, 742 F.2d 1266, 1270 (11th Cir. 1984) ("'the mere legitimate presence on the searched premises by invitation or otherwise, is insufficient in itself to create a protectible expectation'") (quoting <u>United States v. Myers</u>, 656 F.2d 979, 981 (5th Cir. 1981)); <u>Sneed</u>, 732 F.2d at 887 (no expectation of privacy demonstrated when defendant only alleged that he was present on searched premises as a guest); <u>United States v. Rodríguez–Lozada</u>, 558 F.3d 29, 37 (1st Cir. 2009) (holding that a defendant who was "a casual

---

[14] The record shows that someone named Danny Williamson owned the residence.  (<u>See</u> App. & Aff. for Search Warrant [619-2], at 8.)  Ms. Mines apparently rented the house from him.  (<u>Id.</u> at 2.)

visitor for a brief period" in another person's apartment had no reasonable expectation of privacy in the apartment); United States v. Torres, 162 F.3d 6, 10 (1st Cir. 1998) ("Torres was nothing more than a casual visitor in the apartment, and, as such, had no reasonable expectation of privacy there."). Because Mr. Bourassa has failed to show that he has standing to contest the search, he cannot complain that the search warrant was illegally obtained. Accordingly, the Court must reject his challenge to the search of 2200 Beaver Shop Road.

### B.   The Two Vehicle Stops

Although the undersigned reports that Mr. Bourassa lacks standing to challenge the three searches at issue here, he may challenge the stops of the two vehicles in which he was a passenger. See Barnes, 596 F. App'x at 822; United States v. Goicochea-Perez, No. 4:05-CR-57-06-HLM, 2006 WL 8429144, at *1 n.1 (N.D. Ga. Aug. 31, 2006), report and recommendation adopted, No. 4:05-CR-057-06-HLM, 2006 WL 8429189 (N.D. Ga. Sept. 21, 2006). While Mr. Bourassa may not challenge evidence seized from the vehicle, as a passenger he may challenge evidence seized from his person as a result of the stops. See United States v. Barber, No. 1:17-CR-21901-ELR-AJB, 2018 WL 6575889, at *2 (N.D. Ga. Nov. 19, 2018), report and recommendation adopted, 2018 WL 6574699 (N.D. Ga. Dec. 12, 2018). Mr. Bourassa also has standing to challenge the search

24

of a bag belonging to him and located in a seized car if he asserts a reasonable expectation of privacy in it.  United States v. Barber, 777 F.3d 1303, 1305 (11th Cir. 2015) (defendant who was a passenger in a vehicle he did not own had a reasonable expectation of privacy in his bag which was at his feet at the time of the stop of the car).[15]

### 1.     The March 24, 2006 Traffic Stop

Consistent with the Fourth Amendment, a police officer may stop and briefly detain a person or vehicle for investigative purposes if the officer has a reasonable suspicion that the person or vehicle was or is involved in criminal activity.  United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)); see also United States v. Arvizu, 534 U.S. 266, 273 (2002) (Fourth Amendment's protections extend to brief investigatory stops of persons or vehicles).   While reasonable suspicion is "more than an inchoate and unparticularized suspicion or hunch," United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam) (internal quotation marks and

---

[15] The defendant in Barber claimed ownership of the bag.  See Barber, 777 F.3d at 1304 (defendant "argued that the officers searched his bag without probable cause or consent") (emphasis added).  Although police found drugs in the purse located in the passenger-side floorboard of Ms. Mimes's car, Mr. Bourassa has made no claim that the purse belonged to him.

citation omitted), it requires less than probable cause and "'considerably less'" than a preponderance of the evidence. <u>Navarette v. California</u>, 572 U.S. 393, 397 (2014) (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)). Indeed, reasonable suspicion "need not rule out the possibility of innocent conduct." <u>Arvizu</u>, 534 U.S. at 277.

Although an individual may ultimately be engaged in conduct that is perfectly lawful, officers may "detain the individual[] to resolve the ambiguity." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125 (2000). "The [reasonable suspicion] standard takes into account 'the totality of the circumstances—the whole picture.'" <u>Navarette</u>, 572 U.S. at 397 (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)). "[R]easonable suspicion . . . is not concerned with hard certainties, but with probabilities," <u>Lewis</u>, 674 F.3d at 1304 (internal quotation marks and citation omitted), and it is "determined from the totality of the circumstances and collective knowledge of the officers," <u>Nunez</u>, 455 F.3d at 1226, based on what they know at the time of the detention. <u>United States v. Mikell</u>, 102 F.3d 470, 475 (11th Cir. 1996). An officer's reasonable suspicion must be based on "specific articulable facts, together with rational inferences from those facts." <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 884 (1975).

In <u>Cortez</u>, the Supreme Court summarized the governing law as follows:

26

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person.  Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise.  But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible.  First, the assessment must be based upon all the circumstances.  The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.  From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers.  Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.  Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, *supra*, said that, "[t]his demand for specificity in the information upon which

27

> police action is predicated is the central teaching of this Court's
> Fourth Amendment jurisprudence."

Cortez, 449 U.S. at 417-18 (citations omitted).

In this case, the totality of the circumstances provided officers with reasonable suspicion to stop and briefly detain the Mazda 626. As described above, the crimes which occurred in and around Cumberland Mall on March 24, 2006 were serious and had potential to cause harm to the public. With the hijacked car having been abandoned, there was a likelihood that the suspect had fled on foot and was still in the area. Therefore, police quickly dispersed and began to search for a short white male, early 20s, with dark hair and silver on his front teeth, wearing a gray hooded sweatshirt. Within the hour, an officer reported seeing someone acting suspiciously and matching that description at a Red Lobster about one quarter mile from the crime scene. When officers observed this suspect get into a Mazda 626, they stopped the vehicle, detained the occupants (including Mr. Bourassa), and quickly connected the suspect to the crimes.[16]

_____

[16] This traffic stop was not of the traditional sort. It occurred not because the driver committed a moving violation, but because the suspect got into the Mazda 626. Thus, some of the cases defendant cites that deal with vehicle stops

Considering the totality of the circumstances, it was reasonable for the officers to suspect that the short young man in a gray hooded sweatshirt acting suspiciously at the Red Lobster located close to the Mall was the same one who had been involved in an altercation in the Mall's parking lot and then carjacked a woman at a nearby intersection.   These objective facts, taken together with rational inferences from these facts, created a reasonable suspicion that this individual was their suspect, allowing them to stop the vehicle which had picked him up.  See United States v. Felix, 715 F. App'x 958, 963 (11th Cir. 2017) ("[s]topping an individual who matches the description of an armed robber in relative close proximity to the crime scene, within ten minutes of the crime occurring, and patting them down for weapons is well within the bounds of the Fourth Amendment . . . ."); United States v. Hicks, 531 F.3d 555, 558 (7th Cir. 2008) (a stop typically is justified when a suspect matches the description of a person involved in a disturbance near in time and location to the stop).

Defendant argues that there was insufficient certainty that the short young man in the gray hooded sweatshirt at the Red Lobster close to the crime scene

following traffic infractions are inapposite.  The Court notes that defendant does not challenge anything the police did after the vehicle was stopped.

29

was the suspect. (Def.'s Br. 17-18.) He cites in his Reply Brief the non-precedential decision in Commonwealth v. Warren, 58 N.E.3d 530 (Mass. Sup. Jud. Ct. 2016). However, reliance on that case is misplaced. There, police officer Anjos obtained a vague description of perpetrators who stole the victim's backpack, computer, and baseball hats from his bedroom, i.e., three black males, one wearing a black hooded sweatshirt, one wearing a red hooded sweatshirt, and one wearing dark clothing. Id. at 531-32. Officer Anjos broadcast that description and then went on patrol in the area looking for persons who fit it. Id. at 532. Almost thirty minutes after the theft, he spotted two black males, both of whom were dressed in dark clothing. The dark clothing worn by one of them included a hooded sweatshirt. Id. Based on a "hunch" that these two individuals might have been involved in the crime, Officer Anjos lowered his car window and spoke to them, at which point they jogged away; he then radioed in descriptions of these two men. Id. Officer Carr subsequently spotted the two men, and after exiting his car and approaching them, verbally directed them to stop; one did but the defendant ran and was later arrested. Id. at 532-33.

In reversing the trial court's denial of the defendant's motion to suppress, the appellate court stated the following regarding the officers' reliance on the description of the suspects in making the seizure at issue:

30

First, and perhaps most important, because the victim had given a very general description of the perpetrator and his accomplices, the police did not know whom they were looking for that evening, except that the suspects were three black males: two black males wearing the ubiquitous and nondescriptive "dark clothing," and one black male wearing a "red hoodie." Lacking any information about facial features, hairstyles, skin tone, height, weight, or other physical characteristics, the victim's description "contribute[d] nothing to the officers' ability to distinguish the defendant from any other black male" wearing dark clothes and a "hoodie" in Roxbury.

With only this vague description, it was simply not possible for the police reasonably and rationally to target the defendant or any other black male wearing dark clothing as a suspect in the crime. If anything, the victim's description tended to exclude the defendant as a suspect: he was one of two men, not three; he was not wearing a red "hoodie"; and, neither he nor his companion was carrying a backpack. Based solely on this description, Anjos had nothing more than a hunch that the defendant might have been involved in the crime. He acknowledged as much when he explained that the purpose of the stop was "to figure out who they were and where they were coming from and possibly do an FIO." As noted, an FIO is a consensual encounter between an individual and a police officer. Therefore, the defendant was not a "suspect" subject to the intrusion of a threshold inquiry. Unless the police were able to fortify the bare-bones description of the perpetrators with other facts probative of reasonable suspicion, the defendant was entitled to proceed uninhibited as he walked through the streets of Roxbury that evening.

Warren, 58 N.E.3d at 339.[17]

_____

[17] Another factor that affected the court's decision was a report documenting a pattern of racial profiling of black males in the city of Boston by

31

Courts in Massachusetts have subsequently interpreted <u>Warren</u> as holding that "it was unreasonable to stop pedestrians twenty-five minutes after, and one mile away from, a breaking and entering where they did not match the description provided to police." <u>Commonwealth v. Mendez</u>, 69 N.E.3d 968, 975 n.6 (Mass. Sup. Jud. Ct. 2017) (citing <u>Warren</u>, 58 N.E.3d at 339-40).  The facts of this case are different.  Officers here obtained a detailed description of the suspect from the victim and other bystanders, broadcast it, and established a dragnet around the location where the suspect had abandoned the stolen car.  Officer Rita observed someone matching that description acting suspiciously at the nearby Red Lobster. Officer McEntyre testified that his colleague spotted a short man in a gray hooded sweatshirt.  As discussed <u>supra</u> note 3, while that testimony was not explicit on this point, if Officer Rita observed that the individual was male, short, and wearing a gray "hoodie," then the Court can reasonably infer that Officer Rita also observed that this individual was in his 20s with dark hair.  Except for the silver on his teeth, this was a complete match to the suspect's description.

In contrast, the description of the suspect that was deemed insufficient in

---

its Police Department in conducting FIOs.  <u>Warren</u>, 58 N.E.3d at 342.  That is not the case here.

the <u>Warren</u> case mentioned only race and clothes and provided much less detail than the description here.   While the description of the suspects in <u>Warren</u> contributed almost nothing to the officers' ability to distinguish the defendant from any other black male, the description here narrowed the potential number of persons who might be briefly stopped and questioned to short, white, dark-haired males in their twenties wearing grey hooded sweatshirts.   Thus, based on a totality of the circumstances, officers had a particularized and objective basis for suspecting that this particular person spotted by Officer Rita had engaged in criminal activity and lawfully stopped him to make an inquiry.

Defendant seems to demand that the officers had to have been certain that he was the carjacker before detaining him.  "But the law does not require absolute certainty or even probable cause before an officer stops a car; he need only reasonably suspect that its occupants are involved in criminal activity."  <u>United States v. Williams</u>, 619 F.3d 1269, 1271 (11th Cir. 2010).  That was the case here. Officers reasonably suspected that the short young man in the gray hooded sweatshirt had been involved in criminal activity.  When he was seen getting into the Mazda and leaving the area, they lawfully stopped the vehicle.  Therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Search and Seizure [523] that arose from a traffic stop that occurred on March 24, 2006, be

**DENIED**.

### 2.    The March 9, 2013 Traffic Stop

Defendant contends that Lieutenant Dever's stop of the Jeep Liberty driven by Ms. Hollingsworth was pretextual.  He argues that the officer was looking for this vehicle, which other law enforcement suspected of transporting narcotics, and thus fabricated the reason for pulling over her vehicle.  He also asserts that the Lieutenant made an unreasonable mistake as to applicable Georgia law, because O.C.G.A. § 40-6-184[18] does not require a vehicle travelling on the Interstate in

---

[18] This statute provides in relevant part as follows:

(a)  No person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation.

…

(c)   Upon roads, streets, or highways with two or more lanes allowing for movement in the same direction, no person shall continue to operate a motor vehicle in the passing lane once such person knows or should reasonably know that he or she is being overtaken in such lane from the rear by a motor vehicle traveling at a higher rate of speed.  For purposes of this Code section, "passing lane" means the most left-hand lane other than a high occupancy vehicle lane.

O.C.G.A. § 40-6-184(a), (c).

34

the center lane, such as the one operated by Ms. Hollingsworth, to move to the right lane.   Finally, he contends that the record does not show that Ms. Hollingsworth's driving ten miles below the speed limit impeded traffic.   (Def.'s Br. 20-21.)

A traffic stop is a constitutional detention if it is justified by probable cause to believe a traffic violation has occurred.   United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003).   The Constitutional reasonableness of a traffic stop does not depend on the actual motivation of the individual officer involved. Whren v. United States, 517 U.S. 806, 813 (1996); see also City of Indianapolis v. Edmond, 531 U.S. 32, 45 (2000) ("In Whren, we held that an individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe that a traffic violation has occurred.").   "Thus, so long as there was probable cause to believe a traffic violation had occurred, officers' other motives for making a stop are not constitutionally relevant."   United States v. Barnette, No. 4:16-CR-00023-HLM-WEJ-1, 2017 WL 9477735, at *5 (N.D. Ga. June 1, 2017), report and recommendation adopted, 2017 WL 2831402 (N.D. Ga. June 30, 2017) (citing United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (per curiam)).

The Court thus disregards Mr. Bourassa's arguments about Lieutenant Dever's subjective motive and focuses on whether he had probable cause.

The record shows that Lieutenant Dever pulled over the Jeep Liberty for two reasons—(1) not moving over to the right lane as it travelled ten miles below the speed limit and (2) tailgating. The parties dispute which Georgia statute Lieutenant Dever used to justify the first reason for stopping Ms. Hollingsworth's vehicle.[19] The Court need not decide which of those statutes applies, because even if there is dispute with regard to the Lieutenant's first reason for stopping the Jeep Liberty, there is no dispute regarding his second reason.

Lieutenant Dever observed Ms. Hollingworth's vehicle tailgating a minivan. Tailgating, better described as "following too closely," is a violation of Georgia's uniform rules of the road. See O.C.G.A. § 40-6-49(a) ("The driver of a

---

[19] The defendant asserts that Lieutenant Dever applied § 40-6-184 (quoted supra note 18). The Government asserts that he applied § 40-6-40(b), which provides as follows:

> Upon all roadways, any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road or driveway.

36

motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."). An officer who observes a vehicle following another too closely has probable cause to stop the offending vehicle. See Noble v. State, 640 S.E.2d 666, 668-69 (Ga. Ct. App. 2006) (police officer had probable cause to stop defendant's car after he was observed following another car too closely).

Because there was probable cause for Lieutenant Dever to pull over the Jeep Liberty for following the minivan too closely, Mr. Bourassa has no grounds to argue that the vehicle stop was unconstitutional. Therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Search and Seizure [527] that arose from a traffic stop that occurred on March 9, 2013, be **DENIED**.

## V. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant Jeffrey Alan Bourassa's Motions to Suppress Search and Seizure [523, 527, and 631] be **DENIED**.

**SO RECOMMENDED**, this 20th day of May, 2019.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

37