IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

  v.

JEFFREY ALAN BOURASSA,

    Defendant.

CRIMINAL ACTION FILE NO.

4:18-CR-00003-MLB-WEJ-1

**NON-FINAL REPORT AND RECOMMENDATION
RE:  DEFENDANT BOURASSA'S MOTION TO SUPPRESS
INTERCEPTED COMMUNICATIONS [529, 579]**

This matter is before the Court on defendant Jeffrey Alan Bourassa's Motion to Suppress Cobb County Prosecution Wiretaps [529], which was perfected in a Motion with the same title filed on January 24, 2019 [579].  For the reasons stated below, the undersigned **RECOMMENDS** that said Motions be **DENIED**.

I.    **BACKGROUND**

On February 8, 2018, a grand jury in this District returned an Indictment [1] charging Jeffrey Alan Bourassa and others with violations of federal law, including RICO conspiracy (Count 1), conspiracy to possess and distribute controlled substances and substantive drug offenses (Counts 2, 19), carjacking (Count 3), attempted murder (Counts 4, 6, 13-14), kidnapping (Counts 9, 11), maiming (Count

10), assault (Count 12), and various firearms violations (Counts 5, 7-8, 15-18, 20-21).  The charges are based on the defendants' alleged activities as members or associates of a criminal enterprise known as the Ghostface Gangsters ("GFG").

With specific reference to Mr. Bourassa, the Indictment charges him in Count 1 with RICO conspiracy; in Count 2 with conspiracy to traffic a controlled substance and alleges that he is responsible for the distribution of at least 500 grams of methamphetamine (a Schedule II controlled substance), a substance containing a detectable amount of cocaine (a Schedule II controlled substance), a mixture and substance containing a detectable amount of marijuana (a Schedule I controlled substance), and a substance containing Alprazolam (a Schedule IV controlled substance); in Count 9 with kidnapping; and in Count 10 with maiming.  The grand jury returned a Superseding Indictment [279] on August 22, 2018.  The Superseding Indictment adds three defendants and new overt acts and substantive charges involving drug sales, firearms charges, and witness tampering.  However, the charges against Defendant Bourassa are unchanged.

During the investigation of this case, in addition to search warrants and other investigative procedures, between June 17 and August 28, 2008, law enforcement applied for and received a number of orders from judges of the Superior Court of Cobb County, Georgia (using Investigative Warrant 2008-04) authorizing

2

electronic surveillance of telephones allegedly being used to facilitate criminal activity.  The record shows as follows:

1.      On June 17, 2008, Patrick H. Head, District Attorney for the Cobb Judicial Circuit, submitted an Application for an Investigative Warrant of Telephone Number 678.768.2216 (TT#1).  (MCS-080915-08154 to 08167; also reflecting Bates Nos. 8095-8108; copy attached to Def.'s Mot. as Ex. 1 [579-1].)[1] David Schweizer, an agent with the Cobb County Police Department assigned to the Marietta-Cobb-Smyrna ("MCS") Organized Crime Task Force Intelligence Unit, signed the affidavit supporting that application.  (MCS-080915-08181 to 08260, also reflecting Bates Nos. 8122-8201; copy attached to Def.'s Mot. as Ex. 2 [579-2].)[2]  This affidavit ascribed use of TT#1 to Mr. Bourassa.  The same day, the Honorable Michael Stoddard, Superior Court Judge in the Cobb Judicial Circuit, signed an Order authorizing the interception of wire communications for TT#1. (MCS-080915-08168, also reflecting Bates Nos. 8109-8121.)

---

[1] The Government provided the Court with a disk containing pdf files of relevant documents.  The disk's directory reflects each document's initial MCS Bates number, but when opened each document reflects only its handwritten Bates numbers.  The Court provides both references herein.

[2] There is a duplicate Affidavit by Agent Schweizer (MCS-080915-08714, also reflecting Bates Nos. 8655-8734) marked at the top as "Affidavit # 1."

2.      On June 20, 2008, District Attorney Head submitted an Application for an Investigative Warrant for Telephone Number 678.485.4232 (TT#2). (MCS-080915-08274, also reflecting Bates Nos. 8215-8228.) Agent Schweizer signed the affidavit supporting that application. (MCS-080915-08288, also reflecting Bates Nos. 8229-8311.) [3] The same day, Judge Stoddard signed an Order authorizing the interception of wire communications for TT#2. (MCS-080915-08261, also reflecting Bates Nos. 8202-8214.)

3.      On July 16, 2008, District Attorney Head submitted an Application for an Investigative Warrant for Telephone Number 770.865.1767 (TT#3), as well as for renewal of the wiretaps on TT#1 and TT#2. (MCS-080915-08371, also reflecting Bates Nos. 8312-8326.) Agent Schweizer was again the affiant supporting the application. (MCS-080915-08386, also reflecting Bates Nos. 8327-8367.) [4] The same day, Judge Stoddard signed an Order renewing the wiretaps for TT#1 and TT#2 and authorizing the interception of wire communications for TT#3. (MCS-080915-08427, also reflecting Bates Nos. 8368-8381.)

---

[3] There is a duplicate Affidavit by Agent Schweizer (MCS-080915-08794, also reflecting Bates Nos. 8735-8817) marked at the top as "Affidavit # 2."

[4] There is a duplicate Affidavit by Agent Schweizer (MCS-080915-08877, also reflecting Bates Nos. 8818-8858) marked at the top as "Affidavit # 3."

4.      On July 21, 2008, District Attorney Head submitted an Application for an Investigative Warrant of Telephone Number 678.939.8173 (TT#4).  (MCS-080915-08486, also reflecting Bates Nos. 8427-8442.)   Agent Schweizer's affidavit supported the application.  (MCS-080915-08441, also reflecting Bates Nos. 8382-8426.)[5]  The same day, the Honorable G. Conley Ingram, Superior Court Judge in the Cobb Judicial Circuit, signed an Order authorizing the interception of wire communications for TT#4.  (MCS-080915-08502, also reflecting Bates Nos. 8443-8455.)

5.      On August 7, 2008, District Attorney Head submitted an Application for renewal of the wiretap on TT#1 and an Investigative Warrant for Telephone Numbers 770.827.0989 (TT#5) and 404.729.9498 (TT#6).  (MCS-080915-08547, also reflecting Bates Nos. 8488-8501.)  Agent Schweizer provided the affidavit to support the application.  (MCS-080915-08515, also reflecting Bates Nos. 8882-8913 and labeled as the "Fifth Affidavit.")[6]  The same day, the Honorable Grant Brantley, Superior Court Judge in the Cobb Judicial Circuit, signed an Order

---

[5] There is a duplicate Affidavit by Agent Schweizer (MCS-080915-08918, also reflecting Bates Nos. 8854-8881) marked at the top as "Affidavit # 4."

[6] There is a duplicate Fifth Affidavit at MCS-080915-08941, also reflecting Bates Nos. 8456-8487.

renewing the wiretap on TT#1 and authorizing the interception of wire communications for TT#5 and TT#6. (MCS-080915-08561, also reflecting Bates Nos. 8502-8515.)

6.     On August 28, 2008, District Attorney Head submitted an Application for renewal of the wiretap on TT#1 and for an Investigative Warrant for Telephone Numbers 404.200.5592 (TT#7) and 678.665.7310 (TT#8). (MCS-080915-08613, also reflecting Bates Nos. 8554-8568.) Agent Schweizer was again the affiant, submitting a "Sixth Affidavit" in support of that application. (MCS-080915-08575, also reflecting Bates Nos. 8516-8553.) The same day, Judge Stoddard signed an Order renewing the wiretap on TT#1 and authorizing the interception of wire communications for TT#7 and TT#8. (MCS-080915-08628, also reflecting Bates Nos. 8569-8582.)[7]

The Court notes some pertinent provisions of the Renewal Order. First, the Renewal Order directed that "interceptions of wire, oral and electronic communications must terminate upon the attainment of the authorized objectives

_____

[7] This document is captioned "Renewal/Extension Of Order Authorizing The Interception Of Wire, Oral And Electronic Communications (Target Telephone #1) And Authorizing Second Generation Interception Of Additional Communications (Target Telephones #7 And #8)," and will hereafter be referred to as the "Renewal Order." It is also in the record as Government Exhibit 7 [674-7].

or thirty (30) days measured from the date and time this Order is entered, whichever is earlier."  (Renewal Order [674-7], at 13.)  Because the Order was entered on August 28, 2008, interceptions had to cease no later than September 27, 2008.

The Renewal Order also included the following language:

> PROVIDING FURTHER, that the Orders entered herein; application filed in support thereof; affidavit filed in support thereof; the reports filed in the regard thereto; all court reporter's notes, tapes, or disks and all other matters filed or received herein shall remain sealed until further Order of this Court.  Such items are to remain in the custody of the Clerk of Superior Court of Cobb County, pending further order of this Court . . . .

(Renewal Order [674-7], at 13-14.)

Finally, the Renewal Order concluded as follows:  "Let return hereof and report as required by law be made before me within forty (40) days of date hereof or ten (10) days from the date of the last interception, whichever is earlier."  (Gov't Ex. 7 [674-7], at 14; see also Tr. 26.)

Defendant Bourassa asserts that he has standing to challenge all of the wiretap orders and resulting interceptions because he is an "aggrieved person" as defined in 18 U.S.C. § 2510(11).  Defendant further argues that (1) all of the interception orders are lacking in probable cause; (2) the Government failed to demonstrate any necessity for the use of electronic surveillance; (3) the recordings were not timely sealed; (4) the wiretaps were improperly published; and (5) the

7

wiretaps from the Cobb County prosecution were executed in another county in violation of State law.  (Def.'s Mot. [579], at 14-23.)

In its Response, the Government concurs with defendant's claim that he has standing, agreeing that he was the named user of TT#1 in each of the challenged wiretap orders.  (Gov't Resp. 3 [606], at 3.)  The Government contends, however, that defendant's arguments are without merit (id. at 4-13), and asserts that even if the warrants were invalid, the evidence gathered under their auspices would still be admissible pursuant to the "good faith" exception to the exclusionary rule outlined in United States v. Leon, 468 U.S. 897 (1984).  (Id. at 13-14.)

In his Reply, Mr. Bourassa reasserts the arguments made in his Perfected Motion with the exception of the one regarding lack of necessity and contends that application of the good-faith exception to a Title III warrant is not settled.  (See Def.'s Reply [627], at 12-13.)  In response to this Court's Order [630] of March 8, 2019, the Government submitted a Sur-Reply on March 15, 2019, addressing defendant's arguments and asserting that the law regarding Leon's application to Title III warrants is settled.  (Gov't Sur-Reply [641], at 7-8.)

The Court conducted an evidentiary hearing on Mr. Bourassa's Motion to Suppress Cobb County Prosecution Wiretaps on April 11, 2019 [673], which has been transcribed (hereafter "Tr.") and docketed on May 2, 2019 [696].  The exhibits

admitted at that hearing are in the record [674].   Mr. Bourassa filed his Post-Hearing Brief on Wiretap Motion [713] on May 24, 2019.   The Government filed its Opposition to Defendant's Post-Hearing Brief [729] on June 7, 2019.

## II.   **ANALYSIS**

### A.   **Standards Governing Wiretaps**

"Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized."   United States v. Flores, No. 1:05-CR-558-WSD-JFK, 2007 WL 2904109, at *21 (N.D. Ga. Sept. 27, 2007).[8]   For example, pursuant to 18 U.S.C. § 2518, a wiretap application must include:

> a full and complete statement of the facts and circumstances relied upon by the applicant . . . including details as to the particular offense . . ., a particular description of . . . the type of communications

---

[8]   "Under Georgia law, wiretap orders may be issued 'upon written application, under oath, of the prosecuting attorney having jurisdiction over the prosecution of the crime under investigation, or the Attorney General, made before a judge of superior court,' and the wiretap must be consistent with 'Chapter 119 of Title 18 of the United States Code Annotated, as amended.'"   United States v. Cordero, No. 1:11-CR-00009, 2011 U.S. Dist. LEXIS 157435, at *27 (N.D. Ga. Aug. 29, 2011) (quoting O.C.G.A. § 16-11-64(c)), report and recommendation adopted, 2011 U.S. Dist. LEXIS 151967 (N.D. Ga. Sept. 13, 2011).   "Chapter 119 of Title 18 of the United States Code addresses wiretaps in 18 U.S.C. § 2518, making Georgia's wiretap requirements co-extensive with federal law."   Id.

> sought to be intercepted, the identity of the person . . . whose communications are to be intercepted, and a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

United States v. Gonzalez Perez, 283 F. App'x 716, 720 (11th Cir. 2008) (per curiam) (alterations in original) (internal marks omitted) (quoting 18 U.S.C. § 2518(1)(b), (c)).

Upon a proper application, a district judge may issue an ex parte order authorizing the interception of wire communications if

> the judge finds probable cause to believe that an individual is committing or has committed a qualifying offense; that particular communications concerning that offense will be obtained through such interception; and that the facilities from which, or the place where, the communications are to be intercepted are being used in connection with the offense, or are leased to, listed in the name of, or commonly used by such person.

United States v. Duarte-Rosales, No. 1:05-CR-197-6-TWT, 2008 WL 140665, at *2 (N.D. Ga. Jan. 11, 2008) (citing 18 U.S.C. § 2518(3)(a), (b), (d)); see also United States v. Robles, 283 F. App'x 726, 734-35 (11th Cir. 2008) (per curiam).

In reviewing challenges to Title III intercepts, the Court is mindful that "'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" United States v. Stokes, No. 96 CR 481 (SAS), 1996 WL 727400, at *5 (S.D.N.Y. Dec. 18, 1996) (quoting

10

United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975)).  Moreover, "a wiretap order is presumed to be valid, and a defendant has the burden of overcoming the presumption and of proving that the wiretap order was unlawfully obtained."  Flores, 2007 WL 2904109, at *22.

### B.  **Defendant's Arguments**

The Court addresses below each of the arguments that Mr. Bourassa makes in his Motion [579] in the order that he made them.

### 1.  **Probable Cause**

Defendant contends that the affidavits used to obtain the interception orders here were lacking in probable cause.[9]  (Def.'s Mot. [579], at 14-15.)  "Probable cause for a wiretap is the same probable cause required for a search warrant," Duarte-Rosales, 2008 WL 140665, at *2, and "[l]ike other types of warrants, probable cause must exist at the time surveillance is authorized."  Flores, 2007 WL 2904109, at *21 (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir.

---

[9] Although defendant's Motion references all six of Agent Schweizer's Affidavits, he focuses primarily on the First Schweizer Affidavit supporting the application to intercept the telephone purportedly tied to him, TT#1.  (Def.'s Mot. [579], at 11-13 & Def.'s Ex. 2 [579-2] (copy of Schweizer Affidavit).)  Because the First Schweizer Affidavit is the foundation on which the others rest, the Court focuses upon it as well.

1985)).  "[P]robable cause exists if the totality of the circumstances indicate that there is a fair probability that the sought for evidence will be obtained."  United States v. Peterson, 627 F. Supp. 2d 1359, 1363 (M.D. Ga. 2008) (citing Illinois v. Gates, 462 U.S. 213, 239 (1983)).  "The probable cause determination of the judge who issued the wiretap order will be upheld if the judge had a 'substantial basis' for concluding that probable cause existed."  Id. (quoting United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990)).  The Government does not have a duty to establish probable cause as to the interception of calls involving each possible interceptee named in an application for a wiretap order; the Government need only establish that there was probable cause that the telephone in question is being used in an illegal operation.  United States v. Mayfield, No. 2:16-CR-009-RWS-JCF, 2017 WL 9477736, at *8 (N.D. Ga. Feb. 28, 2017), report and recommendation adopted, 2017 WL 4330369 (N.D. Ga. Sept. 29, 2017).

Upon review of the First Schweizer Affidavit, the Court finds that he presented a substantial body of evidence showing Mr. Bourassa's involvement in illegal gang-related activities, which included drug trafficking.  Thus, there was probable cause for the Superior Court Judges to issue their interception orders. Specifically, the First Schweizer Affidavit states that the investigation concerned a criminal organization that self-identified as "Ghost Face," and that "JEFFREY

BOURASSA, a principle user of [a phone] currently assigned number 678-768-2216, is a high ranking member within this criminal organization.  Investigation had shown that BOURASSA's primary function within this criminal organization was to assist and facilitate in the coordination and distribution of large quantities of marijuana, alprazolam and other illegal drugs to other members within this organization."  (First Schweizer Aff. [579-2], at ¶ 8.)  The investigation had established that the defendant was suspected of drug trafficking activity as early as 2006, and statements from informants relating information from other criminal associates indicated that the defendant was a major supplier of marijuana and Alprazolam.  (Id. ¶¶ 10.B; 11.A.4) and 11.A.5).  One of the informants identified TT#1 as Mr. Bourassa's telephone, and confirmed that he had received a phone call from the defendant in November of 2007.  (Id. ¶ 11.A.7.)

The First Schweizer Affidavit detailed physical surveillance showing that Mr. Bourassa was in contact with persons known to be involved in drug trafficking, including individuals who initially gave statements to law enforcement concerning the defendant (some included in the First Schweizer Affidavit, as stated above), who then ceased their cooperation in this investigation because of concerns for their safety and well-being.  (First Schweizer Aff. ¶ 12.B.)  The First Schweizer

13

Affidavit also described the counter-surveillance tactics used by targets of the investigation.  (Id. ¶¶ 12.B.3), E.2) and E.5)).

The First Schweizer Affidavit also summarized communications between TT#1 and other persons who were known to traffic in controlled substances (see First Schweizer Aff. ¶ 20, at pp. 50-55), and summarized calls made to TT#1 by inmates of various jails and prisons (id. pp. 55-69).  Many of these calls involved the defendant's efforts to obtain bond for GFG members, to recover drugs that had been abandoned during arrests, and to discuss potential penalties.[10]  "[P]robable [cause] exists if the totality of the circumstances indicate that there is a fair probability that the sought for evidence will be obtained."  United States v. Booker, No. 1:11-CR-255-TWT, 2013 WL 2468694, *15 (N.D. Ga. June 7, 2013).  There

_____

[10] Defendant's Reply seeks to undermine probable cause by focusing only on claimed infirmities in information provided to law enforcement by two individuals discussed in Agent Schweizer's Affidavit—Messrs. Nixon and Cabe. (Def.'s Reply [627], at 3-6.)  The Court disagrees with defendant's contention that the information provided by these individuals fails to support the existence of probable cause to listen in on Mr. Bourassa's telephone.  But, even if the information they provided was infirm, the recorded telephone calls that several incarcerated individuals made to Mr. Bourassa from local jails in the months preceding issuance of the first interception order provided ample probable cause that TT#1 was being used in connection with drug transactions.

was more than enough particularized information in the First Schweizer Affidavit to support an order to intercept TT#1.

Finally, even if probable cause was lacking in the First Schweizer Affidavit, Leon's good-faith exception applies.  "[T]he purpose of the exclusionary rule is to act as a deterrent to willful conduct that violates individual rights."  United States v. Russell, No. 2:08CR121-WHA, 2008 WL 4649051, at *5 (M.D. Ala. Oct. 20, 2008) (internal marks and citation omitted).  Leon modified the exclusionary rule to permit the admission of evidence seized by police in reasonable, good-faith reliance on a search warrant that is later held to be unsupported by probable cause. Leon, 468 U.S. at 920-22.  The Court reasoned that, where an officer's reliance on a warrant is objectively reasonable, no additional deterrent effect will be achieved by excluding the resulting evidence.  Id.[11]

––––––––––––––––––––

[11] Leon determined that in four circumstances an officer would not have reasonable grounds, i.e., good faith, to believe that the warrant was properly issued: (1) where the issuing judge was misled by information that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing judge "wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319 (1979)"; (3) where the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where a warrant is "so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably

Courts in this District routinely apply <u>Leon</u> to challenges that a wiretap application lacks probable cause.  <u>See</u> <u>United States v. Montemayor</u>, No. 1:09-CR-00551-LMM-JFK, 2018 WL 4517634, at *17 (N.D. Ga. Aug. 27, 2018), <u>report and recommendation adopted</u>, 2018 WL 4517459 (N.D. Ga. Sept. 20, 2018); <u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1248 (N.D. Ga. 2011); and <u>United States v. Sol Rey</u>, No. 1:07-CR-145-WSD-LTW, 2008 WL 11384014, at *6 (N.D. Ga. Mar. 20, 2008), <u>report and recommendation adopted sub nom.</u> <u>United States v. Rey</u>, No. 1:07-CR-145-WSD-LTW, 2008 WL 11383986 (N.D. Ga. May 15, 2008).

In the instant case, "the law enforcement officers did exactly what the law requires," in that applications and affidavits for the wiretaps at issue were submitted to Superior Court judges, all of whom then "made a probable cause determination." <u>Russell</u>, 2008 WL 4649051, at *5.  Given these circumstances, it was objectively reasonable for the agents or officers to conclude that probable cause for the warrants existed and for them to rely in good faith on the wiretap orders issued by those judges.  <u>Id.</u>; <u>see also</u> <u>United States v. Degaule</u>, 797 F. Supp. 2d 1332, 1363 n.26 (N.D. Ga. 2011) ("Even if the wiretaps were found to be invalid, suppression

_____

presume it to be valid."  <u>Leon</u>, 468 U.S. at 923 (internal quotations omitted). Defendant has submitted no evidence or argument suggesting that any of these circumstances exist here.  No evidentiary hearing is needed.

16

of the evidence seized is not warranted because the agents reasonably relied in good faith on the warrants."), report and recommendation adopted, id. at 1344.  In sum, even if the wiretap warrants here lacked probable cause, the evidence gathered under their auspices would still be admissible pursuant to Leon's good-faith exception to the exclusionary rule.

### 2.   Necessity

Defendant contends that the wiretap applications here fail to meet the required standards of necessity, in that the Government has failed to show that traditional methods of investigation would not suffice.  (Def.'s Mot. [579], at 15-17.)  "Pursuant to 18 U.S.C. § 2518, court-ordered electronic surveillance is prohibited unless the government demonstrates the necessity of such techniques." United States v. Wilson, 314 F. App'x 239, 243 (11th Cir. 2009) (per curiam) (citation omitted).  "This statute requires that wiretap applications include a 'full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  United States v. Collins, 300 F. App'x 663, 666 (11th Cir. 2008) (quoting 18 U.S.C. § 2518(1)(c)); see also Wilson, 314 F. App'x at 243.  "The purpose of this statute is to ensure that wiretapping is not resorted to

in situations in which traditional investigative techniques[12] would suffice to expose the crime." Collins, 300 F. App'x at 666. "The affidavit need not show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'" Id. (quoting United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1987)); see also United States v. Pecheco, 489 F.2d 554, 565 (5th Cir. 1974) ("[T]he purpose of the [necessity] requirement in section 2518(1)(c) is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.").

"The district court is entitled to broad discretion in analyzing the necessity issue, and the government's showing on necessity must be read in a practical and commonsense fashion." United States v. Newsome, No. CR 108-062, 2008 WL 4820257, at *3 (S.D. Ga. Nov. 4, 2008) (internal marks and citation omitted). "Congress' purpose in conditioning wiretaps upon a showing of necessity was narrow." United States v. Hammond, No. 2:10-cr-0007-JMS-CMM, 2011 WL

_____

[12] "Traditional investigative techniques include: physical surveillance, cooperating witnesses, informants, controlled drug purchases, pen registers and trap and trace devices." Collins, 300 F. App'x at 667 n.2.

201497, at *5 (S.D. Ind. Jan. 18, 2011).   "Congress wanted to ensure not that wiretaps are used only as a last resort in an investigation, but that they were not to be routinely employed as the initial step in criminal investigation."   Id. (internal marks and citation omitted).   Therefore, "the necessity hurdle is not great."   Id. (internal marks and citations omitted).

Upon review of the First Schweizer Affidavit, the Court finds that the necessity element has been satisfied.   It fully describes the traditional investigative techniques that had been used, and used successfully to some extent, to investigate the GFG.   For example, phone records and consensual calls were useful, as was physical surveillance, as described above.[13]   The First Schweizer Affidavit also described information that was obtained from sources, but those sources either "dried up," or were not in a position to provide all of the information necessary to achieve the goals of the investigation.   The First Schweizer Affidavit also described

---

[13] Physical surveillance and other traditional investigative techniques continued after the electronic surveillance commenced.   For example, on July 13, 2008, agents of the MCS Organized Crime Intelligence and Narcotics Units conducted surveillance of "J.B" (identified as the defendant, Jeffrey Bourassa).   (MCS-080915-00680 to 00690.)   There are similar reports for July 14 (MCS-080915-00691), and reports concerning surveillance and contacts with confidential sources on July 15 (MCS-80915-00707 to 00708) and July 18, 2008 (MCS-08915-00773 to 00774).

19

why it was not possible to position an undercover law enforcement agent within the organization, though agents had been able to make undercover drug buys from members and associates of the GFG.  (First Schweizer Affidavit [579-2], at pp. 69-70, 73-75.)  The First Schweizer Affidavit also described why the use of techniques that would necessarily compromise the covert nature of the investigation could not and should not be used at that stage.  (Id. at 70-71.)

Defendant further claims that the First Schweizer Affidavit is insufficient because it did not contain information establishing the reliability of the confidential sources discussed therein.  (See Def.'s Mot. [579], at 16-17.)  That claim is incorrect.  In describing CS#1, the First Schweizer Affidavit states at page 38 that "[t]he information provided by . . . CS#1, is deemed to be accurate and reliable because CS#1 is in a position to know such information and much of the information has been corroborated by independent investigation and/or other sources of information."  The summaries of information provided by CS#1 included consensual phone calls that resulted in undercover drug transactions. (First Schweizer Affidavit, p. 39.)  The same is true for CS#2.  (See id. pp. 42-44.) There was more than sufficient information regarding the Confidential Sources to allow the issuing courts to judge their credibility.  See United States v. Taylor, 618

F. App'x 969, 971 (11th Cir. 2015) (corroboration of information provided by confidential source sufficient to provide probable cause).

Given the information provided in the First Schweizer Affidavit, the issuing Superior Court Judges could reasonably conclude that traditional investigative techniques could not, by themselves, further the goals of the investigation. "'This circuit has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members.'" Booker, 2013 WL 2468694, at *14 (quoting United States v. Kelley, Crim. No. 08-00327-CG, 2009 WL 2589086, at *2 (S.D. Ala. Aug. 17, 2009)). In other words, absolute exhaustion of traditional investigative methods is unnecessary before seeking the use of electronic surveillance. See United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986) ("The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques

that reasonably suggest themselves.").   In sum, the necessity requirement was met.[14]

### 3.      <u>Immediate Presentation and Sealing</u>

Defendant contends that the documents received in discovery did not support the conclusion that the recordings related to TT#1 had been sealed immediately as required by 18 U.S.C. § 2518(8)(a).  (Def.'s Mot. [579], at 18-19.)  Although the Government located a return showing that the disks containing the recordings were delivered to the Superior Court, it had not located a sealing order by the time it filed a response brief.  (Gov't Opp'n [606], at 9.)  Thus, the parties agreed that an evidentiary hearing was necessary regarding whether the recordings for TT#1 were immediately sealed as required by law.  (<u>See</u> Order of Mar. 8, 2019 [630].)[15]

As noted above, that hearing was held on April 11, 2019, and the issues raised were addressed and then briefed.  (<u>See</u> Def.'s Post-Hr'g Br. [713]; Gov't Opp'n to Def.'s Post-Hr'g Br. [729].)  The Court summarizes the testimony from

_____

[14] Even if necessity was lacking in the First Schweizer Affidavit, <u>Leon</u>'s good-faith exception to the exclusionary rule applies.  <u>See</u> <u>Montemayor</u>, 2018 WL 4517634, at *17; <u>Sol Rey</u>, 2008 WL 11384014, at *6.

[15] That hearing also addressed whether documents relating to the wiretaps were impermissibly published.  This issue is addressed <u>infra</u> Part II.B.4.

that hearing and then discusses the parties' arguments and the legal implications of that testimony.

<div align="center">

**a)      <u>Hearing Testimony</u>**

</div>

The Government presented testimony from (1) Jason Saliba, then an Assistant District Attorney ("ADA") with the District Attorney's Office for the Cobb Judicial Circuit; (2) agent David Schweizer, the aforementioned affiant for the Application for the Investigative Warrant for TT#1; and (3) agent Montie Cutlip, another member of the MCS Organized Crime Task Force during the relevant time period.

Their testimony shows that the last date of interception on TT#1 occurred on September 29, 2008.  (Tr. 10, 26, 38, 57.)  On that date, the wire was taken down and Agent Cutlip removed the disks from the recording equipment, prepared documents relating to those disks, and placed them in a clear plastic evidence bag.  (Tr. 39, 43, 46-47, 55-56, 59-60.)[16]  The documents Agent Cutlip prepared included

---

[16] Agent Cutlip described the process he followed in securing evidence like disks as follows.  He takes a clear plastic bag with an adhesive strip, opens it, drops the evidence in the bag along with the Information Slip (Gov't Ex. 4), making sure the Slip can be read from the outside.  He then removes the adhesive strip, folds the flap down, and seals the bag.  (Tr. 61.)  Government Exhibit 5 [674-5] is a copy of the sealed plastic bag containing the seven DVD-RAM disks.  (<u>Id.</u> at 11, 42, 54.)  The word "sealed" was used often at the evidentiary hearing in both questions and

<div align="center">

23

</div>

a MCS Property Control Form (Gov't Ex. 4 [674-4])[17] and a Cobb County Police Department Evid/Prop Information Slip (Gov't Ex. 6 [674-6].)  (See Tr. 43, 60.)

The MCS Property Control Form (Gov't Ex. 4) lists the evidence to which it relates (in this case, seven DVD-RAM disks) and allows officers to maintain its chain of custody.  (Tr. 11, 13, 41.)  The Information Slip (Gov't Ex. 6), describing what is in the plastic bag, is placed inside the bag before it is closed.  (Id. at 11, 41-42, 44, 60.)  Using a black marker, Agent Cutlip also wrote on the outside of the plastic bag that it contained "(7) DVD-RAM GB DISKS."  (Id. at 42-43, 54-55, 59-60.)  The MCS Property Control Form (Gov't Ex. 4) accompanied the plastic bag.  (Id. at 44, 59.)  Immediately after Agent Cutlip placed the evidence in the plastic bag, Agent Schweitzer deposited both the bag and the MCS Property

_____

answers.  To avoid confusion, the Courts employs the word "sealed" in relation to the plastic evidence bag as referring only to its closure.

[17] Although Agent Cutlip prepared the MCS Property Control Form (Gov't Ex. 4), Agent Schweizer, who was working with his long-time colleague that day, signed it.  (Tr. 43.)  Agent Cutlip testified that this was the first wiretap that Cobb County law enforcement had done "in house," i.e., where his office was managing the disks.  (Id. at 62-63.)

Control Form (Gov't Ex. 4) in an MCS evidence locker.  (<u>Id.</u> at 13-14, 39, 43-44, 47, 49, 55-56, 59, 61.)[18]

On October 7, 2008, eight days after interception ceased, Agent Schweitzer retrieved the plastic bag from the MCS evidence locker, and accompanied by ADA Saliba and ADA Sam Lengen, carried it to Cobb Superior Court, and displayed its contents to the Honorable Watson L. White, a Senior Cobb Superior Court Judge. (Tr. 12, 14, 26-28, 44, 56.)[19]  The record contains the following transcript of the proceeding before Judge White:

> THE COURT:  Who needs to be sworn?
>
> MR. SCHWEIZER:  I do.  This is on Investigative Warrant No. 2008-04.
>
> THE COURT:  To make this official, do you swear that the facts contained in the return and report of Investigative Warrant No. 2008-04 are true and correct?
>
> MR. SCHWEIZER:  I do.

---

[18] There was a testimony about the MCS evidence locker and procedures followed there. (Tr. 40-41, 48-49.)  However, it is undisputed that the plastic bag left the MCS evidence locker in the same condition that it went in.  (<u>Id.</u> at 18, 45, 58.)

[19] The disks were not taken to Judge Stoddard, who had signed the Renewal Order, because he was not available.  (Tr. 27.)  Matters such as this are handled by senior judges, and Judge White was the senior judge on duty on October 7, 2008. (<u>Id.</u>)

MR. SALIBA:  We've got the seven disks with us.  What that basically does is give a return to the Court.  We don't have a sealed order for you this time.  What we have is an order asking you to unseal the entire investigation.  We actually start court hearings on this afternoon.  That will also order the clerk to maintain the originals for ten years as required by federal law.

THE COURT:  Okay.  How many people were arrested?

MR. SALIBA:  Thirty-five arrest warrants; a total of forty-one arrests, and four are still on the loose.

THE COURT:  Did I sign the original?

MR. SALIBA:  No, sir.  Judge Stoddard and Judge Brantley did that. And Judge Ingram.

THE COURT:  I didn't remember this one.

MR. SCHWEIZER:  The first application we did was back in June. This was a continuing investigation.

THE COURT:  What crime?

MR. SCHWEIZER:  This was all for drug trafficking.  A fellow by the name of Jeffrey Rossey [sic], who's been through our court system before, but in this case we were able to expand it a little bit and get a lot of the people who were involved with him, and we ended up with thirty-five warrants.

THE COURT:  I guess that's it.

MR. LENGEN:  Thank you, Judge.

(Gov't Ex. 3 [674-3]; see also Tr. 9-10.)

26

A copy of that Return and Report of Investigative Warrant No. 2008-04, referenced in the fourth paragraph of the above-quoted transcript and presented to the Court on October 7, 2008, is in the record as Government Exhibit 1 [674-1]. That return, prepared by District Attorney Head and sworn before Judge White, contains the following paragraph:

> The aforesaid evidence and information relating to said crimes was recorded by the use of said devices as verbatim telephonic conversations and is now preserved on seven (7) unedited DVD-RAM disks, which along with data obtained from the concurrent pen register/trap and trace is herewith delivered in the custody of this Court for the issuance of such order as to its further custody as the Court may deem proper, pursuant to O.C.G.A. § 16-11-64 and 18 U.S.C. § 2518.4.

(Gov't Ex. 1 [674-1], at 4-5; see also Tr. 6-7, 28.)  Also on October 7, Judge White signed the following Order prepared by ADA Saliba:

> It is hereby ordered that the existence of the interception authority in this case, as well as the contents of the interceptions occurring in this case may be revealed, by the District Attorney for the Cobb Judicial Circuit or his Assistant District Attorneys to whom the case is assigned, in order to assist with the preparation and prosecution of this case.  This order shall include, but not be limited to, testimony of officers in probable cause and bond hearings, grand jury testimony, all stages of the pretrial and trial process and plea discussions with all targets of this investigation and their attorneys.
>
> This order shall be filed and kept ~~sealed~~ by the Clerk of Superior Court for Cobb County and all records in this case, including the original DVD RAM disks, shall be maintained by the Clerk of

> Superior Court for a period of at least ten years from the date of this order pursuant to 18 U.S.C.A. § 2518(8)(b).

(Gov't Ex. 2 [674-2]; see also Tr. 7-9, 28.)[20]

With the signing of this Order, the District Attorney's Office was allowed to share copies of the intercepts with defense counsel and to play portions of those intercepts in asset forfeiture proceedings and other hearings. (Tr. 8, 28, 32.) ADA Saliba added that this Order allowed *copies* of the disks to be used in proceedings that were going on that week against the numerous defendants arrested as a result of this wire. (Id. at 28.) The *original* disks, as referenced in the Return and the Order, could not be used and, pursuant to the Order signed by Judge White, were kept by the Clerk's Office. (Id. at 28-29.) ADA Saliba testified that he did not present a separate sealing Order to Judge White inasmuch as his office was presenting instead an Order to unseal the documents. (Id. at 15, 28.) What he did,

---

[20] ADA Saliba testified that he had prepared this draft Order for the Judge from a template directing that the Order be sealed because that is how his office typically handles filings in Title III cases. (Tr. 8.) However, as shown in the above-quoted text, he struck through the word "sealed" and initialed that change before the Judge. (Id.) According to the ADA, the Clerk's Office cannot provide anyone, including the District Attorney's Office, with copies of documents that are filed under seal. (Id. at 29.)

however, was ask within the Order (Gov't Ex. 2 [674-2]) he presented to the Judge that the Clerk be directed to take custody of and keep the disks.  (Id. at 15.)

Although the Order does not contain the word "sealed," ADA Saliba testified that it informs the Clerk to keep the original DVD-RAM disks.  (Tr. 29-30.)  He asserted that the disks were in a "sealed condition."  (Id. at 30.)  ADA Saliba added that, pursuant to Judge White's Order, the Clerk placed the plastic bag in a large manila envelope, placed his seal on the envelope, placed the envelope in a box, placed his seal on that box, and then stored the box in a safe in the Clerk's Office. The box containing the disks remained there until the Clerk's Office moved to a new location, at which time it was moved into an evidence room.  (Id. at 8-9, 16-17, 32.)

Both ADA Saliba and Agent Cutlip recently visited the Clerk's Office evidence room and confirmed that the seven DVD-RAM disks are still safely stored in the plastic evidence bag.  (Tr. 11-12, 16-17, 58-59.)  Clerk's office personnel opened the sealed box, opened the sealed manila envelope, and displayed the plastic evidence bag containing the seven disks and the Information Slip (Gov't Ex. 6) with the Property Control Form (Gov't Ex. 4) appended to the bag.  (Id. at 16-17.) The plastic bag appeared to be in the same condition as it did when given to the Clerk eleven years ago.  (Id. at 16, 59.)

29

Given the passage of eleven years, none of the witnesses could recall why the disks were stored in the MCS evidence locker for eight days before being taken to Judge White.  (Tr. 10-11, 45, 58.)  ADA Salida testified that he was very busy during this period, conducting interviews with a large number of defendants in this case, preparing for their probable cause hearings (scheduled for October 7), and handling the normal duties in the other 150-200 cases that he was assigned.  (Id. at 17.)  Agent Schweizer testified that this delay occurred against a backdrop of 34-35 arrests, interviewing those arrested, processing evidence, preparing search warrants, and scheduling time to meet with a senior judge.  (Id. at 45-46.)

ADA Saliba testified that he seeks to follow federal law in conducting wiretaps and that it his understanding that one is to seal wiretap disks "immediately or as soon as practicable . . . ."  (Tr. 5-6.)  He indicated that this has been his practice, but added that "[w]e've obviously made mistakes in places, but that's what we try to do."  (Id. at 6.)

Agent Schweizer testified that, given the language of the Renewal Order,[21] he believed agents had forty days to work the wiretap and then ten days (or a

_____

[21] The Renewal Order states:  "Let return hereof and report as required by law be made before me within forty (40) days of date hereof or ten (10) days from

reasonable period of time) to take the disks to the Court.  (Tr. 38.)  Agent Cutlip testified that it was his understanding in 2008 that a return had to be made to the court with the original disks forty days after the signing of the order or ten days after the last intercept.  (Id. at 56-57.)

### b)   Discussion

Defendant contends that the audio recordings of calls made on his telephone (TT#1) must be suppressed because the Government failed to comply with the immediate sealing requirement of Section 2518(8)(a).  He shows that the Government's witnesses at the evidentiary hearing admitted non-compliance with the immediate delivery obligation, claimed to have sealed the disks themselves without a court order, and obtained no final sealing order.  (Def.'s Post-Hr'g Br. [713], at 12-13.)

The Government responds that the disks were immediately placed in a plastic bag by agents, stored securely, and after a few days presented to the Judge, who transferred them to the custody of the Clerk, where they have been sealed for eleven

_____

the date of the last interception, whichever is earlier."  (Gov't Ex. 7 [674-7], at 14; see also Tr. 26.)

31

years.[22]  There is no evidence that the disks have been tampered with in any way. The Government also asserts that it has presented a satisfactory explanation for the delay in presenting the disks to the Judge.  (Gov't Opp'n to Def.'s Post-Hr'g Br. [729], at 21-26.)

The Court begins its discussion with Section 2518(8)(a), which requires in relevant part as follows:

> Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.  Custody of the recordings shall be wherever the judge orders.  . . .  The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C. § 2518(8)(a).  Because the recordings must made available to a judge *immediately* after expiration of the period of monitoring and then *sealed* under his directions, the Court addresses both requirements below.

---

[22] The Government does not contend that the sealing requirement was met when the disks were placed in the plastic evidence bag.  Rather, the Government submits that the sealing requirement was met when the disks were presented to the Judge and subsequently placed in the Clerk's custody in accordance with his Order. (Gov't Opp'n to Def.'s Post-Hr'g Br. [729], at 23.)

The word "immediately" in the statute means "within one or two days." United States v. Matthews, 431 F.3d 1296, 1307 (11th Cir. 2005).  The authority to intercept wire, oral, and electronic communications on TT#1 expired thirty days after the Judge signed the Renewal Order on August 28, 2008, or on September 27, 2008.[23]  (See Renewal Order, Gov't Ex. 7 [674-7], at 14.)  Had the Cobb District Attorney's Office and the investigating agents followed the requirements of Title III and the Matthews case, the disks would have been made available to a judge within two days of expiration of the wiretap authority, or by September 29, 2008. Because the disks were not made available to Judge White until October 7, 2008, eight days too late, the Cobb County prosecution team did not comply with the statute.  Accordingly, the Government must provide a satisfactory explanation for

---

[23] The parties' focused on September 29, 2008, which is the date the Return and Report of Investigative Warrant (Gov't Ex. 1 [674-1]) avers that interception of TT#1 terminated (id. ¶ 4), and the date identified by witnesses at the evidentiary hearing.  As discussed infra, the audio recording of calls on TT#1 ended on or about September 16, 2008, but a pen register/trap and trace remained on that number until September 29, 2008.  However, given the terms of the Renewal Order, interception of all types on TT#1 should have ended by September 27, 2008.  Accordingly, that is the date from which the Court measures compliance with the immediacy requirement. The length of the sealing delay is thus measured from the date the wiretap order (or extension order) expires, not the date the surveillance ends.  See Jones v. United States, 224 F.3d 1251, 1257 (11th Cir. 2000) (recordings must be sealed immediately upon expiration of the order authorizing interception and recording of certain communications).

the delay.  As stated by the Supreme Court in <u>United States v. Ojeda Rios</u>, 495 U.S. 257 (1990), the "'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is excusable." <u>Id.</u> at 265.

In the <u>Mayfield</u> case, Magistrate Judge Fuller discussed extant case law addressing whether explanations provided by the Government for delays in sealing were satisfactory.  <u>Mayfield</u>, 2017 WL 9477736, at *24-29.  Given the similarity between a delay in sealing and a delay in making disks available to a judge, the Court finds such cases applicable.  After discussing the cases, Judge Fuller listed the following factors that should be considered to determine if an explanation is satisfactory:

(1)  the stated reason for the delay;

(2)  the plausibility or believability of the reason, and whether the record shows that reason to be the actual reason for the delay;

(3)  whether the reason is objectively reasonable;

(4)  the length of the delay; and

(5)  whether there is any evidence that the Government delayed to obtain a tactical advantage or to tamper with the recordings, i.e., whether the government acted in bad faith.

<u>Id.</u> at *26.

As for element (1), the passage of eleven years made it difficult for the Government to state the reason for the delay in making the disks available to Judge White. ADA Saliba was forthright in testifying that he had no idea why there was a delay. (Tr. 11.) Nevertheless, ADA Saliba was occupied with handling the many tasks associated with the take down of 30-35 defendants in the Cobb County prosecution (i.e., bond hearings, probable cause hearings, and interviews of defendants) as well as keeping up with the other 150-200 cases assigned to him. Although the ADA knew that the disks had to be presented to the judge immediately, it appears that, given his busy schedule, he may have relied on Agent Schweizer and Cutlip to keep up with this part of the case.

However, those agents were obviously unaware of the immediate presentment rule of Section 2518(8)(a). Instead, Agent Cutlip mistakenly believed that the deadline for making disks available to the Judge was the same as the deadline for making a return. (See Tr. 56-57, stating that a return had to be made to the court with the original disks forty days after the signing of the order or ten days after the last intercept.) Agent Schweizer labored under the mistaken belief that officers had even more time, i.e., forty days to work the wiretap and then ten days or a reasonable time to take the disks before the court. (Id. at 38.) The only conclusion the Court can draw is that ADA Saliba was too busy to comply with the

35

law and that the agents were either unaware of the immediate presentment requirement or confused about when to make the disks available to the Judge given the "report and return" language of the Renewal Order.

As for element (2), the conclusion drawn above is a plausible or believable reason for the delay and appears to be the reason for the delay.  Moreover, the reasons given are objectively reasonable.  Courts have recognized that busy prosecutors can be excused from strict compliance with the time requirements.[24] Further, given the language of the Renewal Order, one can see how the agents may have been confused about their obligations.  As noted above, the Renewal Order directed that a return and report be made to the court "within forty (40) days of date hereof or ten (10) days from the date of the last interception, whichever is earlier." (Gov't Ex. 7 [674-7], at 14.)  The Renewal Order was signed on August 28, 2008.

---

[24] See United States v. Mora, 821 F.2d 860, 870 (1st Cir. 1987) (delays of twenty and forty-one days allowed where officials were ignorant of the sealing requirement and preoccupied with other trials); United States v. Rodriguez, 786 F.2d 472, 478 (2d Cir. 1986) (fourteen-day delay permitted when supervising attorney occupied with another trial); United States v. Scafidi, 564 F.2d 633, 641 (2d Cir. 1977) (seven-day delay permitted when prosecutor preoccupied with upcoming trial). But see United States v. Quintero, 38 F.3d 1317, 1330 (3d Cir. 1994) ("a prosecutor's routine duties, hectic as that routine may be, are not a satisfactory explanation for failing to comply with the immediacy requirement of § 2518(8)(a)."). In fairness to ADA Saliba, the duties associated with the takedown of 30-35 defendants hardly seem routine.  Thus, Quintero is distinguishable.

36

Forty days later was October 7, 2008. The date of the last interception was September 29, 2008. Ten days later was October 9, 2008. Given that October 7 was the earlier date, the return was due to the court by that date. That was the date Agent Schweizer, accompanied by ADA Saliba, took the disks to Judge White. Although Agent Schweizer testified in 2019 that he had more time to make the return, he apparently believed in 2008 that he had ten days from the date of the last intercept to take the disks to the Judge, because that is what he did. Given the terms of the Renewal Order, the agent's mistaken belief that he had ten days to present the disks to Judge White was objectively reasonable. See Mayfield, 2017 WL 9477736, at *28 (given virtually identical language in that Judge's order, the court found that the agent's mistaken belief that he had ten days to present the recordings to the Judge was objectively reasonable).

As for element (4), the delay here was eight days. Courts have excused much longer delays when accompanied by satisfactory explanations. See, e.g., United States v. Wilkinson, 53 F.3d 757, 760 (6th Cir. 1995) (delay of sixteen days); United States v. Sawyers, 963 F.2d 157, 159-60 (8th Cir. 1992) (delays of thirty-two, twelve, and eight days); United States v. Pedroni, 958 F.2d 262, 266 (9th Cir. 1992) (delay of fourteen days); United States v. Maldonado-Rivera, 922 F.2d 934, 950-51 (2d Cir. 1990) (delays of fifteen, sixteen, and nineteen days); Mora, 821

37

F.2d at 870 (delay of forty-one days); <u>Rodriguez</u>, 786 F.2d at 478 (delay of fourteen days); <u>United States v. Diana</u>, 605 F.2d 1307, 1316 (4th Cir. 1979) (delay of thirty-nine days); and <u>United States v. Lawson</u>, 545 F.2d 557, 564 (7th Cir. 1975) (delay of fifty-seven days).

Finally, as for element (5), there is no evidence that the Government delayed presenting the disks to Judge White to obtain a tactical advantage.  (Indeed, the ADA produced copies of the recordings immediately to the defendants in the Cobb County prosecution.)  There is also no evidence that the Government tampered with the disks.  Indeed, the record shows that the agents made good-faith efforts to protect the disks before making them available to the Judge by placing them in an enclosed plastic bag immediately after removing them from the recording equipment and then directly depositing them into a secure evidence locker.

The primary purpose of 18 U.S.C. § 2518(8)(a) is to limit the Government's opportunity to tamper with, alter, or edit the conversations that have been recorded, thus ensuring the "reliability and integrity of evidence obtained through electronic surveillance." <u>Ojeda Rios</u>, 495 U.S. at 263.  As Judge Fuller opined in <u>Mayfield</u>, while the Court in <u>Ojeda Rios</u> indicated that "'proof of nontampering' is not 'a substitute for a satisfactory explanation'. . . that language does not foreclose considering as one factor whether such tampering occurred in determining whether

38

the Government's explanation is satisfactory."  2017 WL 9477736, at *28 (citation omitted).  The Court considers that factor here.  Because no tampering with the disks occurred here, the primary purpose of Section 2518(8)(a) has been achieved.

Mr. Bourassa cites Porter v. State, 432 S.E.2d 629 (Ga. Ct. App. 1993) to support his suppression argument (see Def.'s Post-Hr'g Br. [713], at 14-15), but this case does not control as "federal law determines the admissibility in federal criminal cases of communications intercepted by a state or local officer." United States v. Mathis, 96 F.3d 1577, 1584 (11th Cir. 1996).[25]  Defendant's additional citation to United States v. Gomez, 67 F.3d 1515 (10th Cir. 1995), is also unavailing.  (See Def.'s Post-Hr'g Br. [713], at 13-14.)  Unlike here, where the evidence shows that the disks were made available to the Judge after a short delay and then sealed in the Clerk's Office, there was nothing in the record there to

--------------------

[25] In any event, Porter is distinguishable because the state there offered no explanation for the twenty-one day delay in making the wiretap interceptions available to the superior court judge.  Porter, 432 S.E.2d at 630.  Indeed, the lead investigator testified that he was unaware that federal law required that the tapes be submitted immediately to the court for sealing.  Id.  Here, the agents must have believed that under the terms of the Renewal Order they had ten days to make the disks available to the Judge because that is what happened.  Although mistaken, that was a good-faith explanation.  See Mayfield, 2017 WL 9477736, at *30 (distinguishing Porter on the grounds that the agent testified that he believed he had ten days to present the recordings to the judge based on, inter alia, his review of a previous wiretap authorization order signed by that judge).

suggest that the recordings were ever made available to the state court judge or that the recordings were ever sealed under the court's direction.  Instead, the cassette tapes containing the intercepts were simply placed in a box and left at the police department's evidence room.  Gomez, 67 F.3d at 1524.

Given that the Government has provided a satisfactory explanation for the delay in making the disks available to Judge White, the Court next addresses the sealing requirement.  Section 2518(8)(a) requires that the recordings shall be "sealed under [the judge's] directions.  Custody of the recordings shall be wherever the judge orders."  18 U.S.C. § 2518(8)(a).

Defendant contends that the statutory requirements were not met because there was no separate sealing order.  (Def.'s Post-Hr'g Br. [713], at 17.)  The Government acknowledges that while it may have been prudent to obtain a separate order to seal the disks, failure to obtain one does not merit suppression.  (Gov't Opp'n to Def.'s Post-Hr'g Br. [729], at 23.)  The Court agrees.  In doing so, the undersigned concurs with Judge Fuller, who wrote that "the statute does not require that the issuing judge issue a separate sealing order. . . .  It simply states that the recordings shall be 'sealed under his directions.'"  Mayfield, 2017 WL 9477736, at *23 (quoting 18 U.S.C. § 2518(8)(a)).  Moreover, the Renewal Order, which was filed "UNDER SEAL," directed that "all other matters filed or received herein shall

40

remain sealed until further Order of this Court.  Such items are to remain in the

custody of the Clerk of Superior Court of Cobb County, pending further order of

this Court . . . ."  (Renewal Order [674-7], at 13-14.)[26]

Finally, the documentary evidence shows that Judge White's Order of

October 7, 2008, directed that "all records in this case, including the original DVD

RAM disks, shall be maintained by the Clerk of Superior Court for a period of at

least ten years from the date of this order."  (Gov't Ex. 2 [674-2], at 1.)  The

testimony confirmed that, following Judge White's execution of this Order, the

Clerk's Office took possession of the plastic bag containing the disks, sealed it in

a manila envelope, sealed the manila envelope in a box, placed the box in the safe,

and subsequently transferred the box to an evidence room when the Clerk's Office

moved.  The disks are today in the same state as they were when made available to

Judge White eleven years ago.

_____

[26] In Mayfield, 2017 WL 9477736, at *23, Judge Fuller used the superior court judge's wiretap authorization orders, all of which were filed under seal and which "directed that all wiretap-related documents, court reporter's notes, etc., and 'all other matters filed or received herein shall remained sealed until further Order of this Court,'" to support his rejection of that defendant's contention that the recordings had never been sealed.  The language of the authorization orders in Mayfield are identical to that of the Renewal Order.

41

There was no testimony that Judge White witnessed what the Clerk did with the plastic evidence bag containing the disks.  However, "nothing in the language of § 2518(8)(a) . . . requires the presence of the judge as the sealing of the recordings takes place."  United States v. Abraham, 541 F.2d 624, 627 (6th Cir. 1976).  "The statute only requires that the tapes be made available to the judge, and that they be sealed according to his directions."  United States v. Kincaide, 145 F.3d 771, 778 (6th Cir. 1998).  That is what happened here.  After the disks were made available to Judge White, they were sealed by the Clerk according to his Order, which directed that the original DVD RAM disks be maintained by the Clerk for a period of at least ten years.

In conclusion, based on the above-cited authorities and the testimony and documents presented at the evidentiary hearing, the undersigned reports that the Government has provided a satisfactory explanation for the delay in making the disks available to Judge White, and further reports that the disks were sealed according to his direction and stored safely in the Clerk's Office; therefore, the undersigned recommends that the intercepts not be suppressed for the failure to seal the disks immediately.

### 4.     Impermissible Publication

Defendant asserts that wiretaps from the 2008 Cobb County prosecution were impermissibly published.  (Def.'s Mot. [579], at 20-21.)  The Government could not respond to that assertion because it was not explained.  (Gov't Resp. [606], at 10.)  Mr. Bourassa's Reply provided the missing explanation.  He asserted that personnel from the Cobb County District Attorney's Office attached unredacted forms used in the Bourassa investigation (i.e., unsigned applications and proposed orders related to wiretaps) to materials distributed at a prosecutorial training seminar and may have posted those materials on the internet.  (Def.'s Reply [627], at 9-10.)   Mr. Bourassa attached examples of what he believes was impermissibly disclosed.  (See Def.'s Ex. A [627-1], at 34-57.)  The Government responded that the unfortunate publication of wiretap documents at a prosecutor's training meeting cannot provide a basis for suppression of wiretap evidence at the upcoming trial in this case, and that the state appellate court decision[27] cited by

_____

[27] See State v. Anderson, 463 S.E.2d 34, 35 (Ga. Ct. App. 1995), aff'd in part, rev'd in part, 475 S.E.2d 629 (Ga. 1996), and vacated, 478 S.E.2d 145 (Ga. Ct. App. 1996).

defendant as supporting suppression for violation of this non-publication rule, does not control in federal court.  (Gov't Sur-Reply [641], at 6-7.)

The parties asked questions about this topic at the evidentiary hearing.  ADA Saliba testified that he taught a course in 2010 for the Prosecuting Attorney's Counsel of Georgia ("PAC"), which is attended by law enforcement prosecution personnel.  (Tr. 20.)  When he teaches a course, it is ADA Saliba's practice to provide written handouts, which participants can keep because they are not taken back up.  (Id. at 20-21, 34.)  Some of the handouts he used for that 2010 PAC conference included drafts of a few of the documents related to the Bourassa wire, including the investigative warrant (2008-04).  (Id. at 21, 34-35.)  After the conference, ADA Saliba received notice that those handouts had been posted on PAC's website; this had been done without his knowledge or consent.  (Id. at 21.)

After double-checking the website himself, Mr. Saliba called PAC's training division and inquired why that agency would publish his materials–let alone materials of that nature–outside of its firewall.  (Tr. 21-22.)  He expected that the materials would have been available in a secure, members-only section, where the only individuals who would have access to them would be prosecutors and investigators from the DA's Office, the Solicitor's Office, or the Attorney General's Office.  (Id. at 22.)  It was not his intention that the draft documents he

44

used as handouts be publicized in any way.  (Id.)  According to ADA Saliba, shortly after his conversation with the training division, the conference materials were placed behind PAC's firewall.  (Id.)  He did not know how long the documents had been posted online or who had accessed them.  (Id. at 35.)

As already stated, federal law determines the admissibility in federal criminal cases of communications intercepted by a state or local officer.  See Mathis, 96 F.3d at 1584.  Therefore, whatever action a state court would take for violation of a non-disclosure rule is immaterial.  The question then is whether suppression is the remedy in federal court for disclosure of some of the unexecuted form applications and orders used by Cobb County law enforcement to tap Mr. Bourassa's telephone.  The Court assumes that the forms that ADA Saliba used at his PAC presentation and which were posted for a short time on the internet were substantially the same as those used in the Cobb County prosecution.

The relevant portion of the wiretap statute provides as follows:

Applications made and orders granted under this chapter shall be sealed by the judge.  Custody of the applications and orders shall be wherever the judge directs.  Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

18 U.S.C. § 2518(8)(b).

45

"A failure to comply with the procedures of 18 U.S.C. § 2518(8)(b) may render an interception unlawful and its fruits inadmissible under 18 U.S.C. § 2518(10)(a)(i)."[28]   United States v. Caggiano, 667 F.2d 1176, 1178-79 (5th Cir. Unit B 1982).  However, not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications unlawful.  United States v. Chun, 503 F.2d 533, 541 (9th Cir. 1974) (citing United States v. Chavez, 416 U.S. 562, 574 (1974)).[29]  "[N]oncompliance necessitates suppression . . . only if the violated procedure is a central or a functional safeguard

───────────────

[28] 18 U.S.C. § 2518(10)(a)(i) provides in relevant part as follows:

Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . of the United States . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—

(i)  the communication was unlawfully intercepted . . . .

[29] Chun recognized that the statutory term, "unlawfully intercepted," must be "stretched to include failures of conditions subsequent to a valid authorization and execution.  However, we believe this stretching is within permissible bounds and is in keeping with the spirit of the provision given the purpose of the evidentiary sanction to 'compel compliance with the other prohibitions of the chapter.'"  Chun, 503 F.2d at 542 n.18 (quoting 1968 U.S. Code Cong. and Adm. News at 2184); see also United States v. Lawson, 545 F.2d 557, 564 (7th Cir. 1975) ("we hold that the post-interception violations must also be scrutinized to determine if the failures to satisfy the statutory requirements directly and substantially affect the Congressional intention to limit the use of intercept procedures and to comply with Fourth Amendment principles.").

46

in the statutory scheme to prevent abuses of the wiretap act and if the purpose of the procedure has been frustrated or the procedure has been deliberately ignored." Caggiano, 667 F.2d at 1179 (citing Chun, 503 F.2d at 542).

In United States v. Cantor, 470 F.2d 890 (3d Cr. 1972), the court held that Section 2518(8)(b) "was designed to ensure that the orders and applications are treated confidentially." Id. at 893. In a footnote immediately after that quoted language, the Third Circuit added the following:

> The report of the congressional committee that drafted the statute explained the function of the requirement solely in terms of protecting the confidentiality of sensitive information. See Senate Comm. on the Judiciary, Report on the Omnibus Crime Control and Safe Streets Act of 1967, S. Rep. No. 1097, 90th Cong., 2d Sess. 105 (1968), reprinted in 1968 U.S. Code Cong. & Ad. News pp. 2112, 2194.

Id. at 893 n.1. The court concluded that "the limitations on disclosure in the last sentence of the section indicate that the congressional concern for confidentiality underlay the section." Id. at 893; accord Caggiano, 667 F.2d at 1179 ("The purpose of the sealing requirement is to preserve the confidentiality of wiretap applications and orders.").

Nevertheless, even if the violated procedure is a central or functional safeguard in the statutory scheme to prevent abuses of the wiretap act, and even if the purpose of the procedure has been frustrated or the procedure has been

deliberately ignored, an aggrieved party must nevertheless show that he was *prejudiced* by the noncompliance. Caggiano, 667 F.2d at 1179; see also United States v. Carson, 520 F. App'x 874, 892 (11th Cir. 2013) (showing of prejudice necessary). Mr. Bourassa has not asserted that his defense has been prejudiced in any way by the claimed disclosures of these aforementioned draft applications and orders to persons attending the seminar or through PAC's website. Given the absence of any claimed prejudice, the disclosure does not merit suppression of the intercepts.

### 5. Jurisdiction

Mr. Bourassa asserts that while the orders authorizing the state wiretaps in the Cobb County prosecution were issued by Cobb County Superior Court Judges, the warrants were executed in other counties, thereby rendering them defective under state law. (Def.'s Mot. [579], at 21-23.) The Government responds that defendant does not define what he means by "executed," but interprets the argument as one challenging the jurisdiction of the issuing Superior Court. (Gov't Resp. [606], at 11.) The Government continues by asserting that federal law governs admissibility of state wiretap evidence in federal court, and that as long as the listening post for the wiretap was within the territorial jurisdiction of the court that issued the order, there is no basis for suppression. (Id.) The Defendant replies

48

that the Government's citations do not establish that the law is settled in this area, but even if it were, he contends that the record fails to show where the listening post was in the Cobb County prosecution; thus, he asserts that an evidentiary hearing is needed.  (Def.'s Reply [627], at 12-13.)

"[I]n a federal criminal case, federal law typically governs the admissibility of evidence." United States v. Govea-Vazquez, 962 F. Supp. 2d 1325, 1329 (N.D. Ga. 2013), aff'd sub nom. United States v. Lara, 588 F. App'x 935 (11th Cir. 2014); see also United States v. Mathis, 96 F.3d 1577, 1583 (11th Cir. 1996) ("federal law determines the admissibility in federal criminal cases of communications intercepted by a state or local officer").  Thus, the Court considers it settled that federal law governs the admissibility of state wiretap evidence in federal court. See also Mayfield, 2017 WL 9477736, at *19.

Under federal law, if the listening post is in the State of Georgia, the statutory requirement is met.  See Mayfield, 2017 WL 9477736, at *23; see also Dahda v. United States, 138 S. Ct. 1491, 1499 (2018) ("[A] listening post within the court's territorial jurisdiction could lawfully intercept communications made to or from telephones located within [Georgia] or outside [Georgia].").  At the April 11 hearing, the Government established that the listening post for this intercept was located in Cobb County.  (Tr. 41, 63.)  Thus, no evidentiary hearing is needed on

49

this point, and defendant's jurisdictional argument is no basis for suppression of the wiretap evidence in this case.

Even if the Georgia courts had exceeded their territorial jurisdiction in issuing the wiretap orders, evidence gathered from the resulting interceptions would not be subject to suppression.  As already noted, federal law, which determines the admissibility of wiretap evidence, see United States v. Malekzadeh, 855 F.2d 1492, 1496 (11th Cir. 1988), dictates that "suppression is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'"  Govea-Vazquez, 962 F. Supp. at 1330 (internal citation omitted).  "The Eleventh Circuit held in United States v. Nelson, 837 F.2d 1519 (11th Cir. 1988), that communications intercepted in violation of a state court judge's territorial jurisdiction did not implicate a core concern of Title III, and consequently they did not have to be suppressed."  Id. at 1527.  Thus, defendant's jurisdictional argument is no basis for suppression of the wiretap evidence in this case even if the listening post had not been in Cobb County.  Finally, even if the wiretap warrant failed to comply with any territorial jurisdiction limitation, the evidence remained admissible under Leon's good-faith exception to

50

the exclusionary rule. <u>United States v. Lara</u>, 588 F. App'x 935, 938 (11th Cir. 2014).

## III.    CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS** that Defendant Jeffrey Alan Bourassa's Motion to Suppress Cobb County Prosecution Wiretaps [529], which was perfected in a Motion with the same title filed on January 24, 2019 [579], be **DENIED**.

**SO RECOMMENDED**, this 25th day of July, 2019.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

51