IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

    v.

JEFFREY ALAN BOURASSA, CHERI
LEA RAU, and JOSEPH M. PROPPS,
JR.,

      Defendants.

CRIMINAL ACTION FILE

NO. 4:18-CR-003-MLB-WEJ-1-3-16

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Jeffrey Alan Bourassa's Motion

to Dismiss Indictment or Disqualify Counsel [714].  Defendants Cheri Lea Rau and

Joseph M. Propps have adopted this Motion.  (Mots. to Adopt [740, 774].)  For

reasons explained below, the undersigned **RECOMMENDS** that the Motions be

**DENIED**.

## I.   BACKGROUND

The grand jury charged defendant Bourassa with conspiracy to commit

racketeering ("RICO"), 18 U.S.C. § 1962(d); conspiracy to distribute

methamphetamine, 21 U.S.C. § 846; kidnapping, 18 U.S.C. § 1959(a)(1); and

maiming, 18 U.S.C. § 1959(a)(2).  (Indict. [1]; Super. Indict. [279].)  The grand

jury charged defendant Rau with RICO conspiracy and conspiracy to distribute

methamphetamine.  (Id. Counts One & Two.)   Finally, the grand jury charged defendant Propps with conspiracy to distribute methamphetamine.  (Id. Count Two.)

On May 30, 2019, Mr. Bourassa filed a Motion to Dismiss the Indictment and/or Disqualify the Prosecution Team.  In his Motion, Mr. Bourassa alleged that former Cobb County District Attorney Vic Reynolds represented him in matters later alleged as overt acts in the federal Indictment.  (Mot. [714].)  Mr. Bourassa argues that Mr. Reynold's representation of him and subsequent participation in the federal investigation requires the dismissal of the Indictment or the disqualification of the United States Attorney's Office.  (Id.)  Mr. Propps and Ms. Rau also contend they were represented by Mr. Reynolds before the federal investigation and thus argue for similar remedies as Mr. Bourassa.

The Government responded that (1) Mr. Reynolds did not represent Mr. Bourassa; (2) no conflict of interest existed; (3) Mr. Reynolds did not prosecute any defendant; and (4) no prejudice resulted.  (Gov't Resp. [754].)  On January 7, 2020, the Court conducted an evidentiary hearing [884] to explore the issues set forth in defendants' Motions.  The Transcript [914] of that hearing is in the record.

The parties have also filed post-hearing briefs.  Thus, these Motions are ripe for decision.

## II.   HEARING TESTIMONY

### A.   Mr. Reynolds's Relationship with Defendants

Mr. Reynolds began his private practice in 1999.  (Tr. 10:19-21.)   His practice was primarily criminal defense.  (Id. at 12:15-16.)  Jimmy Berry, a friend of Mr. Reynolds, had office space available and the two began to practice in the same building.  (Id. at 10:23-11:2.)

In 2004, Mr. Reynolds represented Mr. Bourassa's then-wife, Renee Bourassa, and Mr. Berry represented Mr. Bourassa, in a case involving a shooting in Cherokee County.  (Tr. 13:7, 86:4-6.)  In connection with that representation, Mr. Reynolds signed an indictment as representative of Renee Bourassa and, on Mr. Berry's behalf[1], as representative of Mr. Bourassa.  (Id. at 13:1-14; Gov't Ex. 1.)  Mr. Reynolds explained that he and Mr. Berry frequently signed for the other

_____

[1] Messrs. Reynolds and Berry said it was common for one of them to sign or appear for the other at "calendar calls" or other procedural court appearances.  (Tr. 17:20-18:9, 86:24-87:3.)  Mr. Reynolds stated this was common practice in Cobb County and that he also appeared for attorneys other than Mr. Berry.  (Id. at 18:6-13.)

3

if one of them was not available.  (Id. at 13:12-13.)  When Mr. Reynolds signed the indictment, he had some discussion with Ms. Bourassa and may have exchanged pleasantries with Mr. Bourassa, but he never had any attorney/client-privileged conversations with him.  (Id. at 13:21-14:2, 20:13-14.)  The case was eventually moved to the dead docket.  (Id. at 15:2-6.)  Although Mr. Reynolds said he only represented Mr. Bourassa's wife, Mr. Bourassa believed Mr. Reynolds represented him too, because Mr. Reynolds made an appearance on his behalf at his arraignment and Mr. Bourassa testified that he and Mr. Reynolds had confidential conversations regarding plea bargaining.  (Id. at 122:18-123:1.)

Mr. Reynolds represented Mr. Propps.  (See Tr. 24:10-22.)  His representation was limited to assisting Mr. Propps with his parole eligibility.  (See id.)  Mr. Reynolds never personally met Mr. Propps, was retained by his wife, and his representation of Mr. Propps was limited to sending correspondence to the State Board of Pardons and Paroles arguing that it should reduce Mr. Propps's sentence. (Id. at 24:10-25:12.)  Mr. Reynolds never learned any privileged information about Mr. Propps.  (Id. at 25:16-19.)

Mr. Reynolds never represented Ms. Rau.  (Tr. 20:20-21.)  However, Ms. Rau testified that she paid either Mr. Reynolds or Mr. Berry for legal advice they

4

provided her.[2]  (Id. at 113:3-8.)  However, it is possible that this payment was for Mr. Bourassa and his wife's legal representation in the 2004 shooting case.  (Id. at 125:10-11.)

### B.   Mr. Reynolds's and Mr. Berry's Law Practices

Mr. Reynolds testified that he and Mr. Berry were not law partners, but "a lot of people thought we were because we were in the same building together and we were – we tried a number of cases . . . together."[3]  (Tr. 11:13-15.)  Messrs. Reynolds and Berry each had their own professional corporation and formed an LLC for the limited purpose of buying real estate together, but they did occasionally handle cases together.  (Id. 11:8-22.)  They each used stationary with both their names on it, included both their signatures on conflict letters, occasionally had their personal assistants do work for the other, and shared filing cabinets.  (Id. at 34:1-17, 53:2-6, 55:13-17, 91:15-21.)

---

[2] As discussed infra, Ms. Rau testified that she paid Mr. Berry $250 for legal advice.  The receipt for the check had the initials "JB" noted in the receipt, which Ms. Rau testified was because it was payment from her to Mr. Berry.

[3] Mr. Bourassa and Ms. Rau were apparently among those who believed Messrs. Berry and Reynolds were law partners.  (Tr. 109:14-19, 123:13-18.)

On occasion, Messrs. Reynolds and Berry would represent co-defendants whose interests may have been at odds with one another. (Tr. 12:1-4.) When this occurred, he and Mr. Berry refrained from discussing the case together. (Id. at 12:8-11.) Messrs. Reynolds and Berry both stated that they kept their client's confidences when they were representing co-defendants or not working on the same case, especially because one client may be in a better position than the other. (Id. 19:9-23.) They maintained this practice when Mr. Reynolds represented Ms. Bourassa and Mr. Berry represented Mr. Bourassa. (Id. at 19:24-20:7.) Mr. Reynolds stated that he had attorney-client conversations with Ms. Bourassa, but that he never shared any information from these conversations with Mr. Berry. (Id. at 20:4-7.)

### C.   Mr. Reynolds and the Federal Investigation

On January 1, 2013, Mr. Reynolds became the District Attorney ("DA") of Cobb County, Georgia. (Tr. 31:10-12.) During his time as DA, the Cobb County District Attorney's Office shared its investigative files on the Ghostface Gangsters ("GFG")—of which all defendants are allegedly members—with the U.S. Attorney's Office. (Id. at 52:7-14, 61:6-10.) However, Mr. Reynolds was not personally involved in the prosecution, investigation, or daily decisions related to

the GFG cases.  (Id. at 59:20-60:1.)   Additionally, no Cobb County prosecutors worked directly on the federal case or under the direction of the U.S. Attorney.  (Id. at 26:19-21.)

Mr. Reynolds testified that he was not aware of any State investigation into the GFG that assisted the federal investigation.  (Tr. 51:20-23.)  He acknowledged that the Cobb District Attorney's Office used wiretaps in its own GFG investigation, but denied that he was personally involved in them.  (Id. at 51:13-16.)

Despite his lack of personal involvement, Mr. Reynolds attended a press conference with members of the U.S. Attorney's Office announcing the arrest and indictment of defendants.  (Bourassa Ex. 2 [888]; Tr. 49:20-22.)  At the press conference, Mr. Reynolds discussed his Office's cooperation with federal law enforcement; U.S. Attorney Byung Pak also touted the importance of partnering with local and state law enforcement, specifically citing their cooperation with the Cobb County Police Department and the Cobb County District Attorney's Office. (Bourassa Ex. 2.)

## III.   DISCUSSION

Defendants argue that Mr. Reynolds's involvement in their prosecution creates a conflict with his prior representation of them.  (Propps Post-H'rg Mem.

[980] 14-35; Bourassa Post-H'rg Mem. [1002] 7-21; Rau Post-H'rg Br. [1001].) Defendants specifically assert violations of their Fifth and Fourteenth Amendment Due Process rights, their right to counsel, and the Sixth Amendment. (See Mot. to Dismiss Indictment [714].) They argue that Mr. Reynolds's participation in the federal investigation was significant and warrants the dismissal of the Indictment or the disqualification of the federal prosecutors. The Government responds that Mr. Reynolds has never been a member of the federal prosecution team, that Mr. Reynolds did not have a conflict or violate the Georgia Rules of Professional Conduct, and that neither dismissing the Indictment nor disqualifying the prosecution team is an available remedy even if defendants were harmed. (Gov't Propps Resp. Br. [993] 6-16; Gov't Bourassa Resp. Br. [1009]; Gov't Rau Resp. Br. [1016].)

### A.  Mr. Reynolds's Representation of Defendants

Defendants each argue that Mr. Reynolds represented them before the federal investigation and their subsequent federal Indictment. With regard to Mr. Propps, Mr. Reynolds clearly represented him, and admitted as much in his testimony. (Tr. 24:10-22.) As Mr. Reynolds explained, his representation of Mr. Propps was limited to gathering information and sending correspondence to the

8

State Board of Pardons and Parole in an effort to secure Mr. Propps's early release from prison.  (Id. at 25:2-12.)  However, Mr. Reynolds never personally met Mr. Propps and never passed on any privileged information to either anyone in the Cobb County District Attorney's Office or the U.S. Attorney's Office.  (Id. at 25:16-19.)

As for Mr. Bourassa, it does not appear that Mr. Reynolds ever personally represented him.  Mr. Reynolds testified that he represented Mr. Bourassa's wife in a 2004 Cherokee County shooting case, but he denied ever representing Mr. Bourassa. (Tr. 12:19-23.) Mr. Berry testified that he was the one who represented Mr. Bourassa and agreed that Mr. Reynolds represented Ms. Bourassa. (Id. at 86:4-7.)  Meanwhile, Mr. Bourassa testified that he believed Mr. Reynolds was his attorney, a belief partially based on Mr. Reynolds making a short appearance on Mr. Bourassa's behalf.  (Id. at 121:12-18, 122:18-19.)  Mr. Reynolds and Mr. Bourassa also disagreed about whether they ever had confidential conversations. (Id. at 12:19-21, 122:22.)[4]  However, Mr. Bourassa agreed that he never met with

---

[4] Mr. Bourassa testified that he and his wife discussed "very specific things" with Mr. Reynolds that later ended up in the federal Indictment.  (Tr. 125:24-25, 126:1-3.)  However, on cross-examination, Mr. Bourassa declined to elaborate on what information only he and Mr. Reynolds knew that wound up in the federal Indictment.

Messrs. Berry and Reynolds together (id. at 121:21-23) and that Mr. Reynolds would sometimes appear for Ms. Bourassa and stand in for Mr. Berry (id.).

Mr. Bourassa included several exhibits with his Post-Hearing Brief which he believes further demonstrates Mr. Reynolds and Mr. Berry operated as law partners. Among these exhibits is the Articles of Organization for Berry-Reynolds, LLC (Ex. A [1002-1]); a deed showing the transfer of land to Messrs. Reynolds and Berry as joint tenants with right of survivorship (Ex. B [1002-2]; deeds showing the transfer of land from Mr. Reynolds and Mr. Berry to Reid Thompson Properties, LLC[5] (Exs. C [1002-3] and D [1002-4]); a collection of cases found on LexisNexis where Messrs. Berry and Reynolds worked on the same case or that listed "Berry & Reynolds" as counsel[6] (Ex. E [1002-5]); a screenshot of Mr. Reynolds's LinkedIn profile that lists "Berry & Reynolds" under his past career "Experience" (Ex. F

---

[5] Mr. Reynolds testified that he and Mr. Berry formed an LLC for the limited purpose of owning their office space. (Tr. 11:8-22.) However, a deed shows that Messrs. Berry and Reynolds owned their office space as joint tenants with right of survivorship more than six months before they formed their LLC. (Compare Ex. B with Ex. A.) Mr. Reynolds sold his share of the property to Reid Thompson Properties, LLC shortly after being elected DA of Cobb County. (Ex. C.)

[6] Mr. Reynolds acknowledged that he and Mr. Berry worked on cases together and that many thought they were law partners. (Tr. 11:8-22.)

[1002-6], at 2); a screenshot of Mr. Reynolds's Georgia Bureau of Investigation (where Mr. Reynolds is now the Director) biography webpage that states "[Mr. Reynolds] was a partner in the law firm of Berry and Reynolds" (Ex. G [1002-7]); and an Affidavit from Mr. Stephen Reed stating, in relevant part, that he was represented by both Mr. Reynolds and Mr. Berry in a 2006 case in Douglas County and in a 2009 civil case (Ex. H [1002-8] ¶¶ 5-6). Mr. Reed stated he believed Mr. Reynolds and Mr. Berry were law partners because they visited him in jail, had confidential conversations with him, and shared confidential information between each other. (Ex. H ¶¶ 5-6.)

However, these exhibits do not demonstrate anything that was not established by testimony at the hearing. The facts remain that Messrs. Reynolds and Berry: (1) worked out of jointly owned office space; (2) often worked on cases together; and (3) may have appeared to be law partners to the public.

Regardless of whether Mr. Reynolds ever represented Mr. Bourassa, Mr. Bourassa argues that any confidential information exchanged between himself and Mr. Berry may be imputed to Mr. Reynolds because he and Mr. Berry were law partners. (Bourassa Post-H'rg Br. 9-12.) Mr. Bourassa asserts that Mr. Reynolds's imputed knowledge of confidential information and participation in the federal

11

prosecution team represents a conflict of interest that merits dismissal of the Indictment or disqualification of the prosecution. (See id. at 9-14.)

In this case, Georgia Rule of Professional Conduct 1.9 controls. Rule 1.9, entitled "Conflict of Interest: Former Client," states as follows:

> (a)     A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> (b)     A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formally was associated had previously represented a client
>
> > (1)     whose interests are materially adverse to that person; and
> > (2)     about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c), that is material to the matter; unless the former client gives informed consent, confirmed in writing.
>
> (c)     A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> > (1)     use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or
> >
> > (2)     reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

GA. RULE OF PROF'L CONDUCT 1.9.  It is also "well established in [the Eleventh Circuit] that a lawyer's confidential knowledge and loyalties can be imputed to his current partners and employees." Reynolds v. Chapman, 253 F.3d 1337, 1343-44 (11th Cir. 2001).

Practitioners who hold themselves out to be a firm should be regarded as a firm, especially for purposes of imputing conflicts and knowledge of privileged information. GA. RULES OF PROF'L CONDUCT R. 1.10 cmt. 1.  The first comment to Rule 1.10 cautions that "two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm." Id.  The comment also states that "the fact that they [the associated lawyers] have mutual access to information concerning the clients they serve" is relevant to determining if they are a firm.  Id.

Whether lawyers constitute a firm is fact dependent.  In Baybrook Homes, Inc. v. Banyan Construction & Development, Inc., 991 F. Supp. 1440, 1448 (M.D. Fla. 1997), the court found that a group of four attorneys should not be considered a law firm.  The court found that the lack of a formal agreement between the attorneys; the fact that they did not share office space or present themselves as a firm; and the fact that no attorney could access confidential information possessed

13

by another attorney weighed against determining that the attorneys constituted a firm.  Id.

      While Mr. Reynolds denies he and Mr. Berry were law partners, he admits that many people may have reasonably thought they were.  (Tr. 11:13-15.)  Here, Messrs. Berry and Reynolds shared office space, could access each other's case files (though there is no evidence either attorney looked at the other's files), frequently appeared for each other in court—though only for procedural matters, included both their names on letterhead, and shared office staff.  Thus, the facts are in conflict as to whether Messrs. Berry and Reynolds should be considered a firm for purposes of imputed conflicts.  Because this determination does not affect the outcome, the undersigned will assume, arguendo, that Messrs. Berry and Reynolds were a firm for purposes of imputing conflicts.  Thus, any confidential information that Mr. Berry learned from Mr. Bourassa can be imputed to Mr. Reynolds.

      As to Ms. Rau, both Messrs. Berry and Reynolds deny ever representing her.  (Tr. 20:17-19, 21:6-10, 89:23-24.)  Mr. Reynolds also denied that Ms. Rau was ever present for any conversations between him and Ms. Bourassa.  (Id. at 21:8-10).  However, Ms. Rau testified that she paid either Mr. Berry or Mr. Reynolds for legal advice and that Mr. Berry discussed confidential matters with her while

she was in the Cobb County Jail in 2008.  (Id. at 107:13-16, 108:4-23, 111:11-20.)
Mr. Reynolds acknowledged that Ms. Rau paid some legal fees for both Mr.
Bourassa and his then-wife, but denied that any payments were for legal advice
given to her by him.  Specifically, when asked about a $250 check signed by Ms.
Rau, neither Mr. Reynolds nor Mr. Berry could not recall providing services for
which the payment was received.  (Id. at 21:11-13, 102:22-103:3.)[7]  Mr. Reynolds
stated that he would not represent someone for $250, but that he would give advice
and counsel for that amount.  (Id. at 79:9-10, 81:10-14.)  Thus, Ms. Rau did not
establish that either Mr. Reynolds or Mr. Berry ever represented her.[8]  Despite this,
the undersigned will assume, arguendo, that Ms. Rau received some legal advice
from Mr. Berry and that any confidences disclosed can be imputed to Mr. Reynolds.

In sum, Mr. Reynolds clearly represented Mr. Propps, and the undersigned
assumes that the law practices of Messrs. Reynolds and Berry constituted a firm

---

[7] The receipt for the check in question was initialed "JB."  (Tr. 102:24-102:3;
Gov't Ex. 6.)  It was not established whether "JB" signaled it was payment for
Jeffrey Bourassa's legal fees or signified a payment made to Jimmy Berry.

[8] In fact, Ms. Rau's Post-Hearing Brief [1001] did not make any arguments
specifically tailored to the facts of her case; instead it adopted arguments made by
Mr. Bourassa and Mr. Propps.  (Rau Post-H'rg Br. 1.)

such that any confidential information Mr. Berry received regarding Mr. Bourassa and Ms. Rau could be imputed to Mr. Reynolds.   Having established this, the relevant issue remains whether Mr. Reynolds was part of the federal investigation or prosecution team and whether Mr. Reynolds disclosed any confidential information about these three defendants to those responsible for the instant federal prosecution.

### B.   Mr. Reynolds Did Not Violate Rule 1.9

Now, the undersigned must determine whether Mr. Reynolds has ever represented a party adverse to defendants such that it would constitute a violation of Rule 1.9 of the Georgia Rules of Professional Conduct.  Defendants argue that Mr. Reynolds violated Rule 1.9 because he represents the United States in a matter that is substantially related to his previous representation of them while he was a private practitioner.   The Government argues that Mr. Reynolds was never a member of the prosecution team and thus never represented the United States.

As previously stated, a lawyer may not knowingly represent a person in the same or a substantially related matter whose interests are adverse to a client he or his firm has previously represented.   GA. RULE OF PROF'L CONDUCT 1.9.   A "prosecution team" includes both "investigative and prosecutorial personnel."

16

United States v. Meros, 866 F.3d 1304, 1309 (11th Cir. 1989).  This includes "'the prosecutor or anyone over whom he authority.'"  Moon v. Head, 285 F.3d 1301, 1309 (11th Cir. 2002) (quoting Meros, 866 F.3d at 1309)).  Whether a party is a member of the prosecution team is based on the circumstances on a case by case basis.  See Avila v. Quarterman, 560 F.3d 299, 307-08 (5th Cir. 2009).  Courts use principles of agency law to make this determination.  Id.

In United States v. Antone, 603 F.2d 566 (5th Cir. 1979), the United States Attorney's Office used a principal witness whose legal fees had been paid by the State of Florida and who testified falsely that he had personally paid them.  The defendants argued this merited a new trial because the Government had knowingly offered false testimony.  Id. at 569.  The Government argued that, because this was a federal case, knowledge of the false testimony by the state investigators should not be imputed to the federal prosecutor.  Id.  The Fifth Circuit determined that the state investigators were part of the prosecution team.  The "extensive cooperation between the investigative agencies" led the court to conclude "that the state investigators functioned as agents of the federal government under principles of agency law."  Id. at 570.

However, in <u>Moon</u>, the Eleventh Circuit found that Tennessee law enforcement officials were not part of the Georgia state prosecution team. <u>Moon</u>, 285 F.3d at 1310. The Circuit reached this conclusion because "the Georgia and Tennessee agencies shared no resources or labor; they did not work together to investigate [defendant's crimes]" and because the Tennessee investigator was not under the direction or supervision of Georgia officials. <u>Id.</u>

Unlike the state prosecutors in <u>Antone</u>, Mr. Reynolds had limited involvement with the federal investigation. He was aware of the federal investigation into defendants and the GFG, but an assistant district attorney, Jason Saliba, was the one who shared files on Mr. Bourassa with federal law enforcement. (Tr. 61:13-17.) Mr. Reynolds also attended and spoke at a press conference announcing the arrest and indictment of defendants. (<u>Id.</u> at 49:20-22.) However, Mr. Reynolds never communicated with the U.S. Attorney's Office about the investigation, never attended strategy meetings, never made strategic decisions, and neither he nor any assistant district attorneys under his supervision were designated members of the federal prosecution team.

The facts in this case show that Mr. Reynolds was not a member of the federal prosecution team. There was no close cooperation between the Cobb

18

County District Attorney's Office and the U.S. Attorney's Office. The only action taken by Mr. Reynold's office to assist the U.S. Attorney's Office was providing investigative files on Mr. Bourassa. This action was the initiative of Jason Saliba and Mr. Reynolds was not personally involved. This action is insufficient for Mr. Reynolds as DA or the Cobb County District Attorney's Office to be considered agents of the U.S. Attorney's Office. See United States v. Ferguson, 478 F. Supp. 2d 220, 239 (D. Conn. 2007) ("The 'mere fact that the government may have requested and received documents from [another agency] in the course of its investigation does not convert the investigation into a joint one.'") (quoting United States v. Finnerty, 441 F. Supp. 2d 428, 433 (S.D. N.Y. 2006)).

Other than providing the investigative files, the Cobb County District Attorney's Office did not work with the U.S. Attorney's Office to investigate[9] Mr. Bourassa, did not take orders or direction from the U.S. Attorney's Office, and

---

[9] Mr. Reynolds acknowledged that there likely were wiretaps in the GFG state prosecution but denied he had any personal involvement with them. (Tr. 51:13-16.) In Reply [1011], Mr. Propps attached an exhibit showing Mr. Reynolds's signature on several wiretap applications. (Ex. 4 [1012].) These wiretap applications do not target Mr. Propps, Mr. Bourassa, or Ms. Rau. Additionally, defendants have not shown that Mr. Reynolds's signature would appear for any reason other than because his signature as DA is required by Georgia law. See O.C.G.A. § 16-11-64.1.

provided only a <u>de minimis</u> amount of labor to assist in the instant prosecution of defendants.  For these reasons, Mr. Reynolds was never part of the prosecution team.  It follows that Mr. Reynolds has never represented a party adverse to defendants in violation of Rule 1.9—even assuming that he ever represented Mr. Bourassa and Ms. Rau.  Accordingly, the undersigned **RECOMMENDS** that defendants' Motions be **DENIED**.

### C.   The Hearing Should Not be Reopened

Mr. Bourassa's defense counsel points out that she and Mr. Bourassa have never met in person.  (Bourassa Reply [1021] 16-20.)  Mr. Bourassa contends that this has prevented him from fully litigating and investigating the merits of the instant Motion and asks for the hearing to be reopened.  (<u>Id.</u>)

The Court is sympathetic to defense counsel's claim that, since her appointment in March 2020, she has not been able to personally meet with Mr. Bourassa.  However, the ongoing COVID-19 pandemic caused local jails and facilities where federal prisoners are housed to modify their practices.  This includes, in many cases, allowing no personal access to prisoners.  However, the Atlanta Federal Penitentiary ("AFP") where Mr. Bourassa is housed allows private

telephone conversation. [10]   Moreover, as defense counsel is aware, the Court requested (and the U.S. Marshal's Service agreed) that Mr. Bourassa be moved to a facility in Alabama that allows personal visits. Mr. Bourassa's misbehavior soon after his arrival at that facility led to his return to the AFP.   The restrictions that exist at the AFP may remain until the COVID-19 pandemic ends.   Thus, everyone will have to adapt and make do.

In any event, an in-person meeting between Mr. Bourassa and his counsel would not have changed the outcome of the instant Motion.  Mr. Bourassa's prior counsel filed the instant Motion and represented him well at the hearing.  That prior competent, conflict-free counsel was able to investigate, present evidence, and cross-examine the Government's witnesses.   As shown above, evidence that previous counsel presented, including Mr. Bourassa's own testimony, raised a significant issue over whether Messrs. Reynolds and Berry were law partners. Furthermore, current counsel for Mr. Bourassa submitted other relevant but

_____

[10] As defense counsel is aware, when Mr. Bourassa complained that staff members at the AFP were able to overhear his telephone conversations with counsel, the undersigned addressed the privacy issue with the U.S. Marshal's Service.  To the Court's knowledge, since that complaint was made, Mr. Bourassa has had a place for private conversations with counsel.

cumulative documents (discussed above) that support the conclusion that they were law partners.  (Bourassa Post-H'rg Br. Exs. A, B, C, D, E, F, G, H.)

The evidence from the hearing and that submitted post-hearing have led to the Court to assume herein that Messrs. Reynolds and Berry were law partners. However, the bottom line is that no evidence shows that Mr. Reynolds used any confidential information he may have learned, either directly or through Mr. Berry, to prosecute Mr. Bourassa when Mr. Reynolds was the DA.  Similarly, there is no evidence that Mr. Reynolds personally participated in the federal investigation or was part of the federal prosecution.  Neither an in-person meeting between Mr. Bourassa and his counsel nor more time to investigate other aspects of the case would change either result.  Thus, there is no basis for reopening the hearing.

## IV.  **CONCLUSION**

In sum, even assuming that Mr. Reynolds directly or indirectly represented defendants, he never subsequently represented a party adverse to his former clients. This is because neither Mr. Reynold as DA nor the Cobb County District Attorney's Office were agents of the U.S. Attorney's Office; thus, Mr. Reynolds was not a member of the prosecution team for purposes of conflicts and representing the United States.  For the foregoing reasons, the undersigned **RECOMMENDS** that

defendants' Motions to Dismiss Indictment or Disqualify the Prosecution Team [714, 740, 774] be **DENIED**.

      **SO RECOMMENDED**, this 4th day of September, 2020.


_Walter E. Johnson_
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE