## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

United States of America,

v.

Jeffrey Alan Bourassa (1), Cheri
Lea Rau (3), and Joseph M.
Propps, Jr. (16),

Case No. 4:18-cr-3-MLB

                       Defendants.

_____/

## OPINION & ORDER

Defendants Jeffrey Alan Bourassa, Cheri Lea Rau, and Joseph M. Propps, Jr. move to dismiss the indictment or, alternatively, to disqualify the prosecution team. (Dkts. 714; 755; 774.) The Magistrate Judge recommends denying Defendants' motion. (Dkt. 1024.) Defendants object to that recommendation. (Dkts. 1050; 1056; 1071.) The Court overrules Defendants' objections and adopts the Magistrate Judge's report and recommendation ("R&R").

## I.    Background

In August 2018, a federal grand jury returned a 23-count indictment against 23 defendants, including Defendants Bourassa, Rau, and Propps. (Dkt. 279.) The indictment charges Defendant Bourassa

with conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d) (Count 1); conspiracy to traffic a controlled substance in violation of 21 U.S.C. § 846 (Count 2); kidnapping in violation of 18 U.S.C. § 1959(a)(1) (Count 9); and maiming in violation of 18 U.S.C. § 1959(a)(2) (Count 10). (*Id.* at 2–34, 38.)   The indictment also charges Defendant Rau with Counts 1 and 2, and Defendant Propps with Count 2.  (*Id.* at 2–34.)

In Summer 2019, Defendants filed a motion to dismiss the indictment or, alternatively, to disqualify the prosecution team. Defendants say dismissal or disqualification is required because Cobb County District Attorney Victor Reynolds actively participated in this federal prosecution despite representing each Defendant in related matters several years earlier while working as a criminal defense attorney.  Defendants claim Mr. Reynolds essentially "switched sides" (from defending them to prosecuting them) in violation of their due process rights under the Fifth and Fourteenth Amendments, their right to counsel under the Sixth Amendment, and the Georgia Rules of Professional Conduct.

In January 2020, the Magistrate Judge held an evidentiary hearing at which testimony was offered by Mr. Reynolds, Jimmy Berry

(an attorney who shared office space with Mr. Reynolds), Defendant Rau, and Defendant Bourassa. (Dkt. 914.) The parties then filed supplemental briefs. (Dkts. 980; 993; 1001; 1002; 1005; 1009; 1011; 1016; 1021.) Defendant Bourassa's supplemental brief includes a request, joined by Defendant Propps, to reopen the evidence. (Dkts. 1002 at 14–21; 1011 at 3 n.2.) The Magistrate Judge recommends denying Defendants' motion as well as their request to reopen the evidence. (Dkt. 1024.) Defendants objected to the R&R.

## II.   Standard of Review

The district court must "conduct[] a plain error review of the portions of the R&R to which neither party offers specific objections and a de novo review of the Magistrate Judge's findings to which [a party] specifically objects." *United States v. McIntosh*, 2019 WL 7184540, at *3 (N.D. Ga. Dec. 26, 2019); *see* 28 U.S.C. § 636(b)(1) ("[T]he court shall make a de novo determination of those portions of the [R&R] to which objection is made."); *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983) (plain error review appropriate in absence of objection). "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or

general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). After conducting the required review, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## III.   Discussion

Defendants claim Mr. Reynolds actively participated in this federal prosecution despite previously representing them in connection with related matters. Defendants say this violates Rules 1.6, 1.7, and 1.9 of the Georgia Rules of Professional Conduct; the Due Process Clause; and the Sixth Amendment. Defendants further claim that, as a result of these violations, the Court should dismiss the indictment or disqualify the prosecution team. The Court disagrees.[1]

### A.   Georgia Rules of Professional Conduct

#### 1.   Rules 1.7 and 1.9

Rule 1.7 says "[a] lawyer shall not represent or continue to represent a client if there is a significant risk that . . . the lawyer's duties

---

[1] After reviewing the facts surrounding Mr. Reynold's relationship with each Defendant, Magistrate Judge Johnson determined that Mr.

4

to another client, a former client, or a third person will materially and adversely affect the representation of the client." Ga. R. Prof. Conduct 1.7(a). Rule 1.9 includes a similar prohibition: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." *Id.* 1.9(a). The Magistrate Judge found Mr. Reynolds did not violate these rules because, even assuming he previously represented Defendants, he never joined the federal prosecution team in this case

---

Reynolds "clearly represented" Mr. Propps. (Dkt. 1024 at 14–15.) He also assumed arguendo (but did not conclusively find) that "the law practices of Messrs. Reynolds and Berry constituted a firm such that any confidential information Mr. Berry received regarding Mr. Bourassa and Ms. Rau could be imputed to Mr. Reynolds." (*Id.* at 14–16.) Defendant Rau objects to the Magistrate Judge merely assuming this. She insists an attorney-client relationship between her and Mr. Reynolds "was irrefutably established and to find otherwise is an abuse of judicial discretion." (Dkt. 1071 at 2.) Whether or not Mr. Reynolds can be considered to have represented Defendant Rau as a result of his association with Mr. Berry is ultimately immaterial as the Court concludes Mr. Reynolds neither switched sides so as to become part of the prosecution team nor engaged in any other conduct that violated Defendants' constitutional rights. The Court thus declines to opine on the legal result of Mr. Reynolds's informal affiliation with Mr. Berry.

(and thus never represented a party adverse to his former clients).  (Dkt. 1024 at 22.)  The Court agrees.

"The prosecution team is defined as the prosecutor or anyone over whom he [or she] has authority, and includes both investigative and prosecutorial personnel."  *Sargent v. Sec'y, Fla. Dep't of Corr.*, 480 F. App'x 523, 529 (11th Cir. 2012).  Whether state officials are part of a federal prosecution team requires "a case-by-case analysis of the extent of interaction and cooperation between the two governments."  *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979).  In conducting this analysis, courts ask whether the state officials "essentially functioned as agents of the federal government under the principles of agency law."  *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002).

*Antone* and *Moon* provide useful data points on what is required for state officials to count as members of a federal prosecution team.  In *Antone*, the court held that "state agents were in a real sense members of the [federal] prosecutorial team" because both groups "cooperated intimately from the outset of [the] investigation"; they shared "investigative files"; they were part of "a joint investigative task force . . . formed to solve" issues in the case; they held "joint meeting[s]" and

divided tasks; they "pooled their investigative energies to a considerable extent"; "state officers were important witnesses in the federal prosecution"; and "[t]he entire effort was marked by [a] spirit" of "extensive cooperation." *Antone*, 603 F.2d at 568–70.  In contrast, the *Moon* court held a Tennessee law enforcement official was not part of a Georgia prosecution team because, even though "the Georgia prosecutor utilized [him] as a witness to provide background information to the Georgia courts," he "was not under the direction or supervision of the Georgia officials"; he "*could* have refused to share any information with the Georgia prosecutor" (whether or not he actually did so); and "the Georgia and Tennessee agencies shared no resources or labor." *Moon*, 285 F.3d at 1310 (emphasis added).

Our case is far closer to *Moon* than *Antone*.  Like the state official in *Moon*, there is no evidence Mr. Reynolds or anyone in his office was "under the direction or supervision" of federal officials during the investigation and prosecution of these Defendants or that he or anyone in his office was required to "share any information" with the federal prosecutors and investigators.   And, unlike in *Antone*, there is no evidence that Mr. Reynolds's office and the federal prosecution team

7

"cooperated intimately from the outset" of this case; held joint investigative meetings; formed a joint investigative task force; divided tasks; or "pooled their investigative energies to a considerable extent." On the contrary, Mr. Reynolds testified that he was not "involved" in the federal prosecution of Defendants; he was never "involved in *any* prosecution of Jeffrey Bourassa"; he never met with the U.S. Attorney's Office or attended a "strategy meeting" about this case; he never "direct[ed] any part of the federal case"; he made no "strategic or other decisions in the federal investigation"; his Assistant District Attorneys did not work "directly on the federal case or under the direction of the U.S. Attorney"; they were never "designated as part of the federal prosecution team"; he was not aware of "a state investigation that assisted the federal investigation"; he did not meaningfully discuss the investigation with federal officials; and he "always" disqualified himself from "any case involving someone [he] may have represented prior." (Dkts. 754-1 ¶¶ 2, 5; 914 at 10, 23, 26–27, 51, 59–60.)

Defendants counter that, in 2015, Mr. Reynolds's office provided the U.S. Attorney's Office with certain "files" about Defendant Bourassa in response to a request from federal officials investigating this case.  (Dkt.

914 at 26, 52; *see* Dkt. 754-1 ¶ 5.) But "[t]he mere fact that the United States may have requested and received documents from another agency in the course of its investigation does not convert the investigation into a joint one." *United States v. Ferguson*, 478 F. Supp. 2d 220, 239 (D. Conn. 2007) (quoting *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006)). And Mr. Reynolds testified that the 2015 file share "was the extent of any cooperation between the Cobb County District Attorney's Office and the federal government in the Bourassa federal RICO prosecution." (Dkt. 754-1 ¶ 5.) Defendants offered no evidence to contest this representation.[2]

Defendants also point out that, in June 2016, Mr. Reynolds signed a wiretap application seeking authorization for state *and federal* investigative agencies to intercept the communications of several individuals, including four people later named as co-defendants in this case. (Dkt. 1012 at 8–9, 13, 19.) Defendants did not provide the Court

---

[2] While not entirely clear, it appears the 2015 file share was authorized by Mr. Reynolds's deputy chief rather than Mr. Reynolds himself. (Dkts. 914 at 61; 1024 at 18.) There is no evidence about the content of the files, but the Cobb County District Attorney's Office apparently prepared them in connection with a pre-2013 prosecution of Defendant Bourassa before Mr. Reynolds joined the office. (Dkt. 754-1 ¶ 5; *see* Dkt. 914 at 114–115 (discussing Cobb County's 2008 indictment of Defendant Bourassa).)

with this wiretap application until August 2020, more than seven months after the evidentiary hearing at which the Magistrate Judge declared the record closed (and more than a year after Defendants filed their motions). (Dkts. 914 at 135, 138; 1002 at 19–20; 1011 at 3; 1012.)   But, even considering the application, it does not show Mr. Reynolds (or anyone from his office) was part of the federal team prosecuting Defendants in this case.   It is only one wiretap application.   And it does not mention, much less target, any of the Defendants.   Instead, it targets other individuals for state law offenses that may or may not be connected to the current prosecution against Defendants here (there is no clear evidence either way).   The application offers no information as to whether the federal team had "authority" over Mr. Reynolds's office; whether there was any "interaction and cooperation between the two governments" beyond the wiretap itself; or whether Mr. Reynolds's office "functioned as agents of the federal government under the principles of agency law."   *Sargent*, 480 F. App'x at 529; *Moon*, 285 F.3d at 1309; *see also United States v. Hungerford*, 2019 WL 1903212, at *6 (E.D. La. Apr. 29, 2019) (no violation where "defendants[] have not alleged or demonstrated that their former attorneys participated in the prosecution

beyond sitting for interviews or responding to subpoenas"); *United States v. Connolly*, 2017 WL 945934, at *5 (S.D.N.Y. Mar. 2, 2017) ("Interacting with the prosecution team, without more, does not make someone a team member.   Instead, under the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members. . . .  In [some] cases, when an individual's involvement is minor, even the presence of many factors will not [be enough to make them a team member].").

Defendants also place great weight on statements made by federal and state officials at a press conference—and in an accompanying press release—announcing the federal indictment in this case.   These statements credit more than thirty government entities, including Mr. Reynolds's office, with "investigat[ing]" the case; assert that federal authorities were "partnering with local and state law enforcement agencies . . . to stop [Defendants'] criminal enterprise"; thank Mr. Reynolds and another official "for their leadership and the tenacity that they've shown in taking down this gang"; and repeatedly stress "how effective and important interagency collaboration is between

federal, state, and local partners."[3]   Mr. Reynolds spoke at the press conference (albeit for less than a minute), "commend[ing] U.S. Attorney Pak [and] our federal partners for what they've done today," stressing the importance of "federal partnerships," and expressing thanks to state and local officials.[4]

These generalized statements about partnerships—and the related expressions of gratitude—are insufficient to show Mr. Reynolds was part of the federal prosecution team. We know nothing about the specific facts underlying these statements, which makes it impossible to determine whether those facts satisfy the legal test governing membership in a prosecution team.   Moreover, the agencies made these statements in a quasi-political setting in which they had strong incentives to maximize public perception of their unity, cooperation, and involvement in the case. Indeed, Mr. Reynolds testified that his office wanted to participate in the

---

[3] (*See* Dkt. 980 at 9–12); https://www.justice.gov/opa/pr/23-ghostface-gangsters-federally-indicted-racketeering-conspiracy-and-other-charges (Press Release); https://www.11alive.com/article/news/names-and-mugshots-23-allegedghostface-gangster-members-charged/526376674 at 4:50–5:03 (Press Conference).

[4] https://www.11alive.com/article/news/names-and-mugshots-23-allegedghostface-gangster-members-charged/526376674 at 12:28–13:20 (Press Conference).

press conference "from a selfish perspective politically" because it was "something that [would] benefit the office." (Dkt. 914 at 62.) Given the general nature of the statements, and the "press" context in which they were made, they say little about who was (as a legal matter) part of the federal prosecution team in this case.[5]

Defendants next claim the R&R framed the issue in this case too narrowly by focusing only on whether *Mr. Reynolds* joined the prosecution team. Defendants say "the question to be answered is whether Mr. Reynolds *or the Cobb County District Attorney's Office* was part of the prosecution team." (Dkt. 1056 at 10 (emphasis added); *see* Dkt. 1050 at 10.) Even assuming the question should be framed as broadly as Defendants say, the answer remains the same: no. There is no evidence that *anyone* in Mr. Reynolds's office collaborated with federal officials beyond what has already been addressed in this order. Moreover, contrary to Defendants' assertion, the Magistrate Judge did consider the role played by Mr. Reynolds's office—as opposed to Mr. Reynolds personally—in the federal prosecution. The Magistrate

---

[5] To the extent the press statements conflict with Mr. Reynolds's sworn testimony, the Court (like the Magistrate Judge who witnessed his testimony) credits the latter.

Judge found, for example, that "[t]here was no close cooperation between the Cobb County District Attorney's Office and the U.S. Attorney's Office"; "the Cobb County District Attorney's Office did not work with the U.S. Attorney's Office to investigate Mr. Bourassa" (beyond the 2015 file share); it "did not take orders or direction from the U.S. Attorney's Office"; it "provided only a *de minimis* amount of labor to assist in the instant prosecution of defendants"; and, ultimately, "neither Mr. Reynolds as DA *nor the Cobb County District Attorney's Office* were agents of the U.S. Attorney's Office." (Dkt. 1024 at 18–20, 22 (emphasis added).)

Finally, Defendants claim *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985), shows Mr. Reynolds (or his office) was part of the federal prosecution team. The Court again disagrees. In *Schell*, an attorney represented two defendants in connection with grand jury proceedings and then, four months later, joined the U.S. Attorney's Office and worked on those same proceedings as a federal prosecutor. Although "the government attempted to screen [the attorney] from any direct involvement in the cases against his former clients," he did "pose[] questions to certain grand jury witnesses concerning [those] clients." *Id.*

at 566.  At least one witness offered potentially incriminating testimony in response.  *Id.*  The former clients were then indicted and convicted.  The Fourth Circuit ultimately reversed their convictions because the attorney "represented [the clients] concerning the very matter about which he later helped to prosecute and convict them."  *Id.*  The court explained: "The confidentiality of the attorney-client relationship is severely compromised, if not destroyed, when, after representing a client, a lawyer joins in the criminal prosecution of that client *with respect to the identical matter about which the attorney originally counseled the client.*  Such switching of sides is fundamentally unfair and inherently prejudicial."  *Id.* at 565.

The central question in our case is "whether Mr. Reynolds or the Cobb County District Attorney's Office was part of the prosecution team." (Dkt. 1056 at 10; *see* Dkt. 1050 at 10.)  *Schell* does little to answer that question in the affirmative.  The attorney in *Schell* literally became a federal prosecutor at the U.S. Attorney's Office and, in that capacity, actively and personally participated in the case against his former clients.  Mr. Reynolds, in contrast, was never employed by the federal government, much less the U.S. Attorney's Office responsible for this

case.  Nor is there evidence that he (or even his office) meaningfully collaborated with federal authorities to investigate or prosecute the three Defendants for the offenses alleged in the indictment.  The facts in *Schell* are also so much more egregious because the attorney worked as a federal prosecutor on the exact same case in which he defended his former clients just four months earlier.  Here, there were several years between Mr. Reynolds's prior representation of Defendants and the federal prosecution at issue here.  And Mr. Reynolds never actually represented Defendants *in this case*; at most, he represented them in prior matters *related* to this case.  He may have been on one side but was never on the other.

Ultimately, having reviewed the record in the light of Defendants' objections, the Court agrees with the Magistrate Judge that Mr. Reynolds (and his office) were never part of the federal prosecution team.  As a result, Defendants have not shown an ethical violation under Rules 1.7 and 1.9, much less one requiring dismissal of the indictment or disqualification of the prosecution team.

## 2.    Rule 1.6

Rule 1.6 provides that "[a] lawyer shall maintain in confidence all information gained in the professional relationship with a client." Ga. R. Prof. Conduct 1.6(a). Defendants have not shown that Mr. Reynolds disclosed to federal authorities—or otherwise used in this case—any information he learned during his attorney-client relationship with Defendants. Defendants do not identify *any* allegedly disclosed information. And Mr. Reynolds repeatedly testified that no such disclosures occurred. He testified, for example, that he never disclosed "anything . . . of an attorney/client nature" involving Defendant Propps. (Dkt. 914 at 25.) He testified that he never even received any privileged information from or about Defendant Bourassa and that, although he did have "attorney/client conversations" with Defendant Bourassa's wife, he never shared that information "with anyone" after becoming a prosecutor. (*Id.* at 14, 20; *see id.* at 43 ("I don't recall any substantive conversations of any nature" with Defendant Bourassa), 47 ("I don't have any recollection of ever, other than maybe generalities, speaking in any substantive form to Mr. Bourassa."); *see also id.* at 89; Dkt. 754-1 ¶ 3.) Mr. Reynolds also testified that he could not recall "any substantive

17

conversation[s]" with Defendant Rau (though Defendant Rau believes such conversations occurred in 2004).  (Dkt. 914 at 21, 58, 110–113, 117.)

Defendant Bourassa claims "very specific things . . . ended up in this indictment that no one else knew except [Mr. Reynolds]." (*Id.* at 125; *see also* Dkts. 760-1 ¶ 4 (Defendant Bourassa testifying that he shared "confidential information" with Mr. Reynolds); 914 at 122–123 (same).) That sounds ominous.  But Defendant Bourassa declined to identify those "specific things" or otherwise elaborate on his claim.  Given his lack of specificity, the absence of any supporting evidence, and Defendant Reynolds's testimony to the contrary, Defendants have not established a violation of Rule 1.6.[6]

## B.    Due Process Clause

Defendants assert a due process claim based on their theory that Mr. Reynolds joined the federal prosecution team or disclosed client

---

[6] Defendants apparently believe there is a presumption that Mr. Reynolds disclosed their confidences to the federal prosecution team because this case is substantially similar to the matters in which Mr. Reynolds represented them previously. (*See, e.g.*, Dkts. 1050 at 8–9; 1056 at 8.)    But the presumption on which they rely refers to whether *the defendant* disclosed relevant information to his attorney, not whether the attorney later passed that information to another client.  *See, e.g.*, *United States v. Henry*, 307 F. App'x 331, 335 (11th Cir. 2009) ("The rule

confidences in violation of the Georgia Rules of Professional Conduct. *See, e.g.*, *United States v. LaVallee*, 439 F.3d 670, 681 (10th Cir. 2006) ("The right to due process and a fair trial include the essential element that there is no unfair advantage to the prosecution by reason of a prior professional relationship between a member of its staff and a criminal defendant concerning the same or closely related matter."). Because Defendants have not established either ethical violation, their due process claim fails as well.

To the extent Defendants assert a broader Fifth Amendment claim based on "outrageous government conduct" that does not depend on Mr. Reynolds's membership in the federal prosecution team or his disclosure

---

of law in this circuit is (and will continue to be) that once the former client proves that the subject matters of the present and prior representations are 'substantially related,' the court will irrebutably presume that relevant confidential information was disclosed *during the former period of representation*." (emphasis added)). Moreover, the presumption applies only if defendant's attorney "represents an adverse party" in the same or a substantially similar case. *United States v. Kitchin*, 592 F.2d 900, 904 (5th Cir. 1979); *see Summerlin v. Johnson*, 335 S.E.2d 879, 880–81 (Ga. Ct. App. 1985) (no need to "show what confidences might be betrayed" if attorney "*accept[s] employment* and appear[s] in a case against his former client" (emphasis added)). As the Court has already explained, Mr. Reynolds never represented the federal government in this case. So the presumption does not apply here.

of client confidences, they fail to assert that theory clearly or cite any authority to support its application here.  To prevail under such a theory, "the law enforcement technique must be so outrageous that it is fundamentally unfair and shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment."  *United States v. Ofshe*, 817 F.2d 1508, 1516 (11th Cir. 1987).  "Vanishingly few decisions have found [such] a due process violation," including in the context of "government intrusion into the attorney client relationship."  *Gaetano v. United States*, 942 F.3d 727, 732 (6th Cir. 2019).  "The defense is to be invoked only in the rarest and most outrageous of circumstances."  *Ofshe*, 817 F.2d at 1516.

Those circumstances are simply not present here.  Even assuming Mr. Reynolds ever represented Defendants, he did so several years ago in collateral matters.  There is no good evidence that he ever disclosed client confidences or that he played any meaningful role in this federal prosecution beyond signing a wiretap application (that did not target Defendants) and possibly authorizing his staff to share historical

"case files" (whose contents are unknown) with federal officials.   The Court cannot find a due process violation on these facts.

### C.   Sixth Amendment

Defendants also assert a violation of their Sixth Amendment right to counsel.  But they never develop that argument in their briefing.  They make "only passing reference to it," which means "the argument is deemed waived and [the Court] need not address it."  *United States v. Evans*, 292 F. App'x 761, 762 (11th Cir. 2008); *see United States v. Buffington*, 629 F. App'x 875, 876 (11th Cir. 2015) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.").

Even if Defendants properly raised a Sixth Amendment claim, it would fail on the merits.  "The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel, and effective assistance includes a right to counsel unimpaired by conflicting loyalties."  *Reynolds v. Chapman*, 253 F.3d 1337, 1342 (11th Cir. 2001).  But "[i]n order to demonstrate a violation of [these] Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."

21

*Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  Defendants have not made that showing.

First, there was no "actual conflict of interest" here because Mr. Reynolds never switched sides and represented the federal government in this case.  Second, even assuming a conflict existed, it arose *after* Defendants' attorney-client relationship with Mr. Reynolds had run its course.  That is, Mr. Reynolds's alleged representation of Defendants concluded years ago, long before he participated in this case and thus long before he could have developed "an actual conflict of interest" arising out of that participation.  This is fatal to Defendants' claim because, to implicate the Sixth Amendment, a defendant's attorney must be conflicted "*during* the time that he or she represented the [defendant]."  *Fullwood v. Lee*, 290 F.3d 663, 690 n.15 (4th Cir. 2002) (emphasis altered); *see United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985) (no Sixth Amendment violation where attorney "talked to federal agents about *past* representation of a client" because he was not "*in the process* of representing [the client] in defending against a criminal

charge" (emphasis added)).[7]   Third, even assuming Mr. Reynolds was somehow conflicted when he represented Defendants, there is no evidence whatsoever that this conflict "adversely affected" his performance.   Finally, no one claims Mr. Reynolds ever represented Defendants *in this federal case*; at most, he represented Defendants in other proceedings involving events that later became relevant to this prosecution.   It would be inappropriate to impose a remedy in this case for ineffective assistance allegedly rendered in another case.   For all of these reasons, Defendants have not established a Sixth Amendment violation.

## D.   Defendants' Request to Reopen the Evidence

Defendants move to reopen the evidence so they can build a stronger record to support their claims.   Specifically, they want to introduce new evidence showing that Mr. Reynolds previously represented Defendants (either personally or indirectly through his law

---

[7] Defendant Bourassa claims Mr. Reynolds continued to represent him in a related state criminal case until 2020 because Mr. Reynolds never formally withdrew from the case when he became Cobb County District Attorney in 2013.   (Dkt. 914 at 10, 134.)   That seems like a stretch, especially since the state case was assigned to the "dead docket" in 2007 and remained there until it was dismissed in 2019.   (Dkts. 886 at 9; 914 at 15, 44–45, 120.)

firm).  (*See* Dkts. 1002 at 16–19; 1071 at 2.)   But this evidence is immaterial because the Court's conclusions do not depend on the existence or non-existence of a prior attorney-client relationship between Mr. Reynolds (or his firm) and the Defendants.  They depend instead on Mr. Reynolds's involvement in the federal prosecution of Defendants for the offenses alleged in the indictment.

Defendants also want to introduce the wiretap application signed by Mr. Reynolds in June 2016.  (Dkt. 1002 at 19–20.)  That is certainly relevant evidence.  But the Court has already addressed the application elsewhere in this order, finding it insufficient to establish Defendants' claims.  So there is little reason to reopen the record to admit it.

Finally, Defendant Bourassa claims the evidence should be opened because he and his current attorney (appointed in March 2020) have never met in person.  (Dkt. 1002 at 20–21.)  The COVID-19 pandemic is largely responsible for Defendant Bourassa's inability to meet with counsel.  (*See, e.g.*, Dkts. 976; 1024 at 20–21.)   Jails and prisons are entitled to limit in-person meetings during this "unprecedented" pandemic in order to protect inmates and staff from infection.  *Hawbaker v. Dix*, 2020 WL 5931050, at *4 (N.D. Ga. Oct. 5, 2020) ("The obvious

ripple effect of allowing unfettered in-person meetings between inmates and their lawyers at the jail is an increased risk of infection in a closed population of individuals where social distancing is either difficult or impossible."). That is especially true where, as here, the inmate has telephonic access to counsel. (Dkt. 1024 at 20–21); *see Dix*, 2020 WL 5931050, at *4 ("In allowing telephone, email, and mail communication, the jail provided reasonable alternatives [to in-person meetings with counsel]."); *cf. Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992) ("Although prisoners have a constitutional right of meaningful access to the courts [including to counsel], prisoners do not have a right to any particular means of access.").

Moreover, the central issue in the R&R is whether Mr. Reynolds joined—or disclosed attorney-client information to—the federal prosecution team. The Court agrees with the Magistrate Judge that an in-person meeting between Defendant Bourassa and his counsel would not affect the outcome of either issue. (Dkt. 1024 at 22.) Defendant Bourassa has already testified (both on paper and in court) in support of his claims. There is little reason to think he could now add anything significant about the extent to which Mr. Reynolds participated in this

federal prosecution (an issue about which he likely has limited, if any, firsthand knowledge). All three Defendants have had ample time to confer with counsel and introduce evidence in support of their motion. They filed their motion more than a year ago (well before Defendant Bourassa's current counsel was appointed). They had months to prepare for the evidentiary hearing (which occurred before Defendant Bourassa's current counsel was appointed). They had several more months to prepare supplemental briefing (both before and after Defendant Bourassa's current counsel was appointed). And they enjoyed countless deadline extensions throughout all these proceedings. It is time (probably past time) for the Court to resolve Defendants' motion and move this case forward. Dragging things out any further is unlikely to change the outcome of Defendants' motion. For all of these reasons, the Court denies Defendants' request to reopen the evidence.[8]

---

[8] If Defendant Bourassa means he has literally *never* communicated confidentially with his current counsel, even by telephone, that would be concerning. But, if that is what he means, he does not say it clearly. Nor does he offer any evidence to support that claim. In June 2020, he did notify the Court that "the only means of contact between Defendant Bourassa and [his] counsel have been short non-confidential phone calls." (Dkt. 983 at 2.) The Magistrate Judge apparently "addressed the privacy issue with the U.S. Marshal's Service" and, according to the Magistrate

## IV.   Conclusion

The Court **OVERRULES** Defendants' Objections (Dkts. 1050; 1056; 1071), **ADOPTS** Magistrate Judge Walter E. Johnson's Non-Final Report and Recommendation (Dkt. 1024), and **DENIES** Defendants' Motions to Dismiss Indictment and/or Disqualify Prosecution Team (Dkts. 714; 755; 774).

**SO ORDERED** this 31st day of December, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

Judge, Defendant Bourassa thereafter "had a place for private conversations with counsel." (Dkt. 1024 at 21 n.10.)  After the Magistrate Judge's intervention, Defendant Bourassa noted in substantive briefs that he had "never met" current counsel and that it was "crucial [he] be provided with an opportunity to confidentially speak with his attorney." (Dkts. 1002 at 20–21; 1021 at 20.)  But he never repeated what he said clearly in his June 2020 filing: that his ability to communicate confidentially with counsel was literally non-existent.  And even if he had, he has not identified any specific prejudice resulting from the non-confidentiality of his communications with counsel.  *See United States v. Willis*, 2020 WL 3866853, at *5 (S.D. Ohio July 9, 2020) ("[E]ven a deliberate intrusion on the right to confidential communication does not constitute a Sixth Amendment violation in the absence of prejudice.").